(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOLDER, ATTORNEY GENERAL, ET AL. *v.* HUMANITARIAN LAW PROJECT ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1498.  Argued February 23, 2010—Decided June 21, 2010*

It is a federal crime to "knowingly provid[e] material support or resources to a foreign terrorist organization."  18 U. S. C. §2339B(a)(1). The authority to designate an entity a "foreign terrorist organization" rests with the Secretary of State, and is subject to judicial review. "[T]he term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."  §2339A(b)(1).  Over the years, §2339B and the definition of "material support or resources" have been amended, *inter alia,* to clarify that a violation requires knowledge of the foreign group's designation as a terrorist organization or its commission of terrorist acts, §2339B(a)(1); and to define the terms "training," §2339A(b)(2), "expert advice or assistance," §2339A(b)(3), and "personnel," §2339B(h).

Among the entities the Secretary of State has designated "foreign terrorist organization[s]" are the Partiya Karkeran Kurdistan (PKK) and the Liberation Tigers of Tamil Eelam (LTTE), which aim to establish independent states for, respectively, Kurds in Turkey and Tamils in Sri Lanka.  Although both groups engage in political and humanitarian activities, each has also committed numerous terrorist attacks, some of which have harmed American citizens.  Claiming

——————

*Together with No. 09–89, *Humanitarian Law Project et al.* v. *Holder, Attorney General, et al.,* also on certiorari to the same court.

they wish to support those groups' lawful, nonviolent activities, two
U. S. citizens and six domestic organizations (hereinafter plaintiffs)
initiated this constitutional challenge to the material-support stat-
ute. The litigation has had a complicated 12-year history. Ulti-
mately, the District Court partially enjoined the enforcement of the
material-support statute against plaintiffs. After the Ninth Circuit
affirmed, plaintiffs and the Government cross-petitioned for certio-
rari. The Court granted both petitions.

As the litigation now stands, plaintiffs challenge §2339B's prohibi-
tion on providing four types of material support—"training," "expert
advice or assistance," "service," and "personnel"—asserting violations
of the Fifth Amendment's Due Process Clause on the ground that the
statutory terms are impermissibly vague, and violations of their First
Amendment rights to freedom of speech and association. They claim
that §2339B is invalid to the extent it prohibits them from engaging
in certain specified activities, including training PKK members to use
international law to resolve disputes peacefully; teaching PKK mem-
bers to petition the United Nations and other representative bodies
for relief; and engaging in political advocacy on behalf of Kurds living
in Turkey and Tamils living in Sri Lanka.

*Held:* The material-support statute, §2339B, is constitutional as applied
to the particular forms of support that plaintiffs seek to provide to
foreign terrorist organizations. Pp. 8–36.

(a) This preenforcement challenge to §2339B is a justiciable Article
III case or controversy. Plaintiffs face "a credible threat of prosecu-
tion" and "should not be required to await and undergo a criminal
prosecution as the sole means of seeking relief." *Babbitt* v. *Farm
Workers*, 442 U. S. 289, 298. P. 10.

(b) The Court cannot avoid the constitutional issues in this litiga-
tion by accepting plaintiffs' argument that the material-support stat-
ute, when applied to speech, should be interpreted to require proof
that a defendant intended to further a foreign terrorist organization's
illegal activities. That reading is inconsistent with §2339B's text,
which prohibits "knowingly" providing material support and demon-
strates that Congress chose knowledge about the organization's con-
nection to terrorism, not specific intent to further its terrorist activi-
ties, as the necessary mental state for a violation. Plaintiffs' reading
is also untenable in light of the sections immediately surrounding
§2339B, which—unlike §2339B—do refer to intent to further terrorist
activity. See §§2339A(a), 2339C(a)(1). Finally, there is no textual
basis for plaintiffs' argument that the same language in §2339B
should be read to require specific intent with regard to speech, but
not with regard to other forms of material support. Pp. 10–12.

(c) As applied to plaintiffs, the material-support statute is not un-

constitutionally vague. The Ninth Circuit improperly merged plaintiffs' vagueness challenge with their First Amendment claims, holding that "training," "service," and a portion of "expert advice or assistance" were impermissibly vague because they applied to protected speech—regardless of whether those applications were clear. The Court of Appeals also contravened the rule that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 495.

The material-support statute, in its application to plaintiffs, "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *United States* v. *Williams*, 553 U. S. 285, 304. The statutory terms at issue here—"training," "expert advice or assistance," "service," and "personnel"—are quite different from the sorts of terms, like "'annoying'" and "'indecent,'" that the Court has struck down for requiring "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.,* at 306. Congress has increased the clarity of §2339B's terms by adding narrowing definitions, and §2339B's knowledge requirement further reduces any potential for vagueness, see *Hill* v. *Colorado*, 530 U. S. 703, 732.

Although the statute may not be clear in every application, the dispositive point is that its terms are clear in their application to plaintiffs' proposed conduct. Most of the activities in which plaintiffs seek to engage readily fall within the scope of "training" and "expert advice or assistance." In fact, plaintiffs themselves have repeatedly used those terms to describe their own proposed activities. Plaintiffs' resort to hypothetical situations testing the limits of "training" and "expert advice or assistance" is beside the point because this litigation does not concern such situations. See *Scales* v. *United States*, 367 U. S. 203, 223. *Gentile* v. *State Bar of Nev.*, 501 U. S. 1030, 1049–1051, distinguished. Plaintiffs' further contention, that the statute is vague in its application to the political advocacy they wish to undertake, runs afoul of §2339B(h), which makes clear that "personnel" does not cover advocacy by those acting entirely independently of a foreign terrorist organization, and the ordinary meaning of "service," which refers to concerted activity, not independent advocacy. Context confirms that meaning: Independently advocating for a cause is different from the prohibited act of providing a service "to a foreign terrorist organization." §2339B(a)(1).

Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by §2339B. On the other hand, a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization. Plaintiffs argue that this construction of the

statute poses difficult questions of exactly how much direction or co-
ordination is necessary for an activity to constitute a "service." Be-
cause plaintiffs have not provided any specific articulation of the de-
gree to which *they* seek to coordinate their advocacy with the PKK
and the LTTE, however, they cannot prevail in their preenforcement
challenge. See *Washington State Grange* v. *Washington State Repub-
lican Party*, 552 U. S. 442, 454. Pp. 13–20.

   (d) As applied to plaintiffs, the material-support statute does not
violate the freedom of speech guaranteed by the First Amendment.
Pp. 20–34.

      (1) Both plaintiffs and the Government take extreme positions on
this question. Plaintiffs claim that Congress has banned their pure
political speech. That claim is unfounded because, under the mate-
rial-support statute, they may say anything they wish on any topic.
Section 2339B does not prohibit independent advocacy or member-
ship in the PKK and LTTE. Rather, Congress has prohibited "mate-
rial support," which most often does not take the form of speech. And
when it does, the statute is carefully drawn to cover only a narrow
category of speech to, under the direction of, or in coordination with
foreign groups that the speaker knows to be terrorist organizations.
On the other hand, the Government errs in arguing that the only
thing actually at issue here is conduct, not speech, and that the cor-
rect standard of review is intermediate scrutiny, as set out in *United
States* v. *O'Brien*, 391 U. S. 367, 377. That standard is not used to
review a content-based regulation of speech, and §2339B regulates
plaintiffs' speech to the PKK and the LTTE on the basis of its con-
tent. Even if the material-support statute generally functions as a
regulation of conduct, as applied to plaintiffs the conduct triggering
coverage under the statute consists of communicating a message.
Thus, the Court "must [apply] a more demanding standard" than the
one described in *O'Brien*. *Texas* v. *Johnson*, 491 U. S. 397, 403. Pp.
20–23.

      (2) The parties agree that the Government's interest in combat-
ing terrorism is an urgent objective of the highest order, but plaintiffs
argue that this objective does not justify prohibiting their speech,
which they say will advance only the legitimate activities of the PKK
and LTTE. Whether foreign terrorist organizations meaningfully
segregate support of their legitimate activities from support of terror-
ism is an empirical question. Congress rejected plaintiffs' position on
that question when it enacted §2339B, finding that "foreign organiza-
tions that engage in terrorist activity are so tainted by their criminal
conduct that any contribution to such an organization facilitates that
conduct." §301(a), 110 Stat. 1247, note following §2339B. The record
confirms that Congress was justified in rejecting plaintiffs' view. The

PKK and the LTTE are deadly groups. It is not difficult to conclude, as Congress did, that the taint of their violent activities is so great that working in coordination with them or at their command legitimizes and furthers their terrorist means. Moreover, material support meant to promote peaceable, lawful conduct can be diverted to advance terrorism in multiple ways. The record shows that designated foreign terrorist organizations do not maintain organizational firewalls between social, political, and terrorist operations, or financial firewalls between funds raised for humanitarian activities and those used to carry out terrorist attacks. Providing material support in any form would also undermine cooperative international efforts to prevent terrorism and strain the United States' relationships with its allies, including those that are defending themselves against violent insurgencies waged by foreign terrorist groups. Pp. 23–28.

(3) The Court does not rely exclusively on its own factual inferences drawn from the record evidence, but considers the Executive Branch's stated view that the experience and analysis of Government agencies charged with combating terrorism strongly support Congress's finding that all contributions to foreign terrorist organizations—even those for seemingly benign purposes—further those groups' terrorist activities. That evaluation of the facts, like Congress's assessment, is entitled to deference, given the sensitive national security and foreign relations interests at stake. The Court does not defer to the Government's reading of the First Amendment. But respect for the Government's factual conclusions is appropriate in light of the courts' lack of expertise with respect to national security and foreign affairs, and the reality that efforts to confront terrorist threats occur in an area where information can be difficult to obtain, the impact of certain conduct can be difficult to assess, and conclusions must often be based on informed judgment rather than concrete evidence. The Court also finds it significant that Congress has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns. Most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups. Given the sensitive interests in national security and foreign affairs at stake, the political branches have adequately substantiated their determination that prohibiting material support in the form of training, expert advice, personnel, and services to foreign terrorist groups serves the Government's interest in preventing terrorism, even if those providing the support mean to promote only the groups' nonviolent ends.

As to the particular speech plaintiffs propose to undertake, it is wholly foreseeable that directly training the PKK on how to use in-

ternational law to resolve disputes would provide that group with information and techniques that it could use as part of a broader strategy to promote terrorism, and to threaten, manipulate, and disrupt. Teaching the PKK to petition international bodies for relief also could help the PKK obtain funding it would redirect to its violent activities. Plaintiffs' proposals to engage in political advocacy on behalf of Kurds and Tamils, in turn, are phrased so generally that they cannot prevail in this preenforcement challenge. The Court does not decide whether any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny. It simply holds that §2339B does not violate the freedom of speech as applied to the particular types of support these plaintiffs seek to provide. Pp. 28–34.

(e) Nor does the material-support statute violate plaintiffs' First Amendment freedom of association. Plaintiffs argue that the statute criminalizes the mere fact of their associating with the PKK and the LTTE, and thereby runs afoul of this Court's precedents. The Ninth Circuit correctly rejected this claim because §2339B does not penalize mere association, but prohibits the act of giving foreign terrorist groups material support. Any burden on plaintiffs' freedom of association caused by preventing them from supporting designated foreign terrorist organizations, but not other groups, is justified for the same reasons the Court rejects their free speech challenge. Pp. 34–35.

552 F. 3d 916, affirmed in part, reversed in part, and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 08–1498 and 09–89

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL., PETITIONERS
08–1498              *v.*
HUMANITARIAN LAW PROJECT ET AL.

HUMANITARIAN LAW PROJECT, ET AL., PETITIONERS
09–89               *v.*
ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2010]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Congress has prohibited the provision of "material support or resources" to certain foreign organizations that engage in terrorist activity. 18 U. S. C. §2339B(a)(1). That prohibition is based on a finding that the specified organizations "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §301(a)(7), 110 Stat. 1247, note following 18 U. S. C. §2339B (Findings and Purpose). The plaintiffs in this litigation seek to provide support to two such organizations. Plaintiffs claim that they seek to facilitate only the lawful, nonviolent purposes of those

groups, and that applying the material-support law to prevent them from doing so violates the Constitution. In particular, they claim that the statute is too vague, in violation of the Fifth Amendment, and that it infringes their rights to freedom of speech and association, in violation of the First Amendment. We conclude that the material-support statute is constitutional as applied to the particular activities plaintiffs have told us they wish to pursue. We do not, however, address the resolution of more difficult cases that may arise under the statute in the future.

I

This litigation concerns 18 U. S. C. §2339B, which makes it a federal crime to "knowingly provid[e] material support or resources to a foreign terrorist organization."[1] Congress has amended the definition of "material support or resources" periodically, but at present it is defined as follows:

"[T]he term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1

---

[1] In full, 18 U. S. C. §2339B(a)(1) provides: "UNLAWFUL CONDUCT.— Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism . . . ." The terms "terrorist activity" and "terrorism" are defined in 8 U. S. C. §1182(a)(3)(B)(iii), and 22 U. S. C. §2656f(d)(2), respectively.

or more individuals who may be or include oneself), and transportation, except medicine or religious materials." §2339A(b)(1); see also §2339B(g)(4).

The authority to designate an entity a "foreign terrorist organization" rests with the Secretary of State. 8 U. S. C. §§1189(a)(1), (d)(4). She may, in consultation with the Secretary of the Treasury and the Attorney General, so designate an organization upon finding that it is foreign, engages in "terrorist activity" or "terrorism," and thereby "threatens the security of United States nationals or the national security of the United States." §§1189(a)(1), (d)(4). "'[N]ational security' means the national defense, foreign relations, or economic interests of the United States." §1189(d)(2). An entity designated a foreign terrorist organization may seek review of that designation before the D. C. Circuit within 30 days of that designation. §1189(c)(1).

In 1997, the Secretary of State designated 30 groups as foreign terrorist organizations. See 62 Fed. Reg. 52650. Two of those groups are the Kurdistan Workers' Party (also known as the Partiya Karkeran Kurdistan, or PKK) and the Liberation Tigers of Tamil Eelam (LTTE). The PKK is an organization founded in 1974 with the aim of establishing an independent Kurdish state in southeastern Turkey. *Humanitarian Law Project* v. *Reno*, 9 F. Supp. 2d 1176, 1180–1181 (CD Cal. 1998); Brief for Petitioners in No. 08–1498, p. 6 (hereinafter Brief for Government). The LTTE is an organization founded in 1976 for the purpose of creating an independent Tamil state in Sri Lanka. 9 F. Supp. 2d, at 1182; Brief for Government 6. The District Court in this action found that the PKK and the LTTE engage in political and humanitarian activities. See 9 F. Supp. 2d, at 1180–1182. The Government has presented evidence that both groups have also committed numerous terrorist attacks, some of which

have harmed American citizens.  See App. 128–133.  The LTTE sought judicial review of its designation as a foreign terrorist organization; the D. C. Circuit upheld that designation.  See *People's Mojahedin Organization of Iran* v. *Dept. of State*, 182 F. 3d 17, 18–19, 25 (1999).  The PKK did not challenge its designation.  9 F. Supp. 2d, at 1180.

Plaintiffs in this litigation are two U. S. citizens and six domestic organizations: the Humanitarian Law Project (HLP) (a human rights organization with consultative status to the United Nations); Ralph Fertig (the HLP's president, and a retired administrative law judge); Nagalingam Jeyalingam (a Tamil physician, born in Sri Lanka and a naturalized U. S. citizen); and five nonprofit groups dedicated to the interests of persons of Tamil descent.  Brief for Petitioners in No. 09–89, pp. ii, 10 (hereinafter Brief for Plaintiffs); App. 48.  In 1998, plaintiffs filed suit in federal court challenging the constitutionality of the material-support statute, §2339B.  Plaintiffs claimed that they wished to provide support for the humanitarian and political activities of the PKK and the LTTE in the form of monetary contributions, other tangible aid, legal training, and political advocacy, but that they could not do so for fear of prosecution under §2339B.  9 F. Supp. 2d, at 1180–1184.[2]

As relevant here, plaintiffs claimed that the material-

------

[2] At the time plaintiffs first filed suit, 18 U. S. C. §2339B(a) (2000 ed.) provided: "Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both."  See *Humanitarian Law Project* v. *Reno*, 9 F. Supp. 2d 1205, 1207 (CD Cal. 1998).  And 18 U. S. C. §2339A(b) (2000 ed.) defined "material support or resources" to mean "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."

support statute was unconstitutional on two grounds: First, it violated their freedom of speech and freedom of association under the First Amendment, because it criminalized their provision of material support to the PKK and the LTTE, without requiring the Government to prove that plaintiffs had a specific intent to further the unlawful ends of those organizations. *Id.*, at 1184. Second, plaintiffs argued that the statute was unconstitutionally vague. *Id.*, at 1184–1185.

Plaintiffs moved for a preliminary injunction, which the District Court granted in part. The District Court held that plaintiffs had not established a probability of success on their First Amendment speech and association claims. See *id.*, at 1196–1197. But the court held that plaintiffs had established a probability of success on their claim that, as applied to them, the statutory terms "personnel" and "training" in the definition of "material support" were impermissibly vague. See *id.*, at 1204.

The Court of Appeals affirmed. 205 F. 3d 1130, 1138 (CA9 2000). The court rejected plaintiffs' speech and association claims, including their claim that §2339B violated the First Amendment in barring them from contributing money to the PKK and the LTTE. See *id.*, at 1133–1136. But the Court of Appeals agreed with the District Court that the terms "personnel" and "training" were vague because it was "easy to imagine protected expression that falls within the bounds" of those terms. *Id.*, at 1138; see *id.*, at 1137.

With the preliminary injunction issue decided, the action returned to the District Court, and the parties moved for summary judgment on the merits. The District Court entered a permanent injunction against applying to plaintiffs the bans on "personnel" and "training" support. See No. CV–98–1971 ABC (BQRx), 2001 WL 36105333 (CD Cal., Oct. 2, 2001). The Court of Appeals affirmed. 352 F. 3d 382 (CA9 2003).

Meanwhile, in 2001, Congress amended the definition of "material support or resources" to add the term "expert advice or assistance." Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Patriot Act), §805(a)(2)(B), 115 Stat. 377. In 2003, plaintiffs filed a second action challenging the constitutionality of that term as applied to them. 309 F. Supp. 2d 1185, 1192 (CD Cal. 2004).

In that action, the Government argued that plaintiffs lacked standing and that their preenforcement claims were not ripe. *Id.*, at 1194. The District Court held that plaintiffs' claims were justiciable because plaintiffs had sufficiently demonstrated a "genuine threat of imminent prosecution," *id.*, at 1195 (internal quotation marks omitted), and because §2339B had the potential to chill plaintiffs' protected expression, see *id.*, at 1197–1198. On the merits, the District Court held that the term "expert advice or assistance" was impermissibly vague. *Id.*, at 1201. The District Court rejected, however, plaintiffs' First Amendment claims that the new term was substantially overbroad and criminalized associational speech. See *id.*, at 1202, 1203.

The parties cross-appealed. While the cross-appeals were pending, the Ninth Circuit granted en banc rehearing of the panel's 2003 decision in plaintiffs' first action (involving the terms "personnel" and "training"). See 382 F. 3d 1154, 1155 (2004). The en banc court heard reargument on December 14, 2004. See 380 F. Supp. 2d 1134, 1138 (CD Cal. 2005). Three days later, Congress again amended §2339B and the definition of "material support or resources." Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), §6603, 118 Stat. 3762–3764.

In IRTPA, Congress clarified the mental state necessary to violate §2339B, requiring knowledge of the foreign group's designation as a terrorist organization or the

group's commission of terrorist acts. §2339B(a)(1). Congress also added the term "service" to the definition of "material support or resources," §2339A(b)(1), and defined "training" to mean "instruction or teaching designed to impart a specific skill, as opposed to general knowledge," §2339A(b)(2). It also defined "expert advice or assistance" to mean "advice or assistance derived from scientific, technical or other specialized knowledge." §2339A(b)(3). Finally, IRTPA clarified the scope of the term "personnel" by providing:

> "No person may be prosecuted under [§2339B] in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." §2339B(h).

Shortly after Congress enacted IRTPA, the en banc Court of Appeals issued an order in plaintiffs' first action. 393 F. 3d 902, 903 (CA9 2004). The en banc court affirmed the rejection of plaintiffs' First Amendment claims for the reasons set out in the Ninth Circuit's panel decision in 2000. See *ibid.* In light of IRTPA, however, the en banc court vacated the panel's 2003 judgment with respect to vagueness, and remanded to the District Court for further proceedings. *Ibid.* The Ninth Circuit panel assigned to the cross-appeals in plaintiffs' second action (relating to "expert advice or assistance") also remanded in light of IRTPA. See 380 F. Supp. 2d, at 1139.

The District Court consolidated the two actions on remand. See *ibid.* The court also allowed plaintiffs to challenge the new term "service." See *id.*, at 1151, n. 24. The parties moved for summary judgment, and the District Court granted partial relief to plaintiffs on vagueness grounds. See *id.*, at 1156.

The Court of Appeals affirmed once more. 552 F. 3d 916, 933 (CA9 2009). The court first rejected plaintiffs' claim that the material-support statute would violate due process unless it were read to require a specific intent to further the illegal ends of a foreign terrorist organization. See *id.*, at 926–927. The Ninth Circuit also held that the statute was not overbroad in violation of the First Amendment. See *id.*, at 931–932. As for vagueness, the Court of Appeals noted that plaintiffs had not raised a "facial vagueness challenge." *Id.*, at 929, n. 6. The court held that, as applied to plaintiffs, the terms "training," "expert advice or assistance" (when derived from "other specialized knowledge"), and "service" were vague because they "continue[d] to cover constitutionally protected advocacy," but the term "personnel" was not vague because it "no longer criminalize[d] pure speech protected by the First Amendment." *Id.*, at 929–931.

The Government petitioned for certiorari, and plaintiffs filed a conditional cross-petition. We granted both petitions. 557 U. S. ___ (2009).

## II

Given the complicated 12-year history of this litigation, we pause to clarify the questions before us. Plaintiffs challenge §2339B's prohibition on four types of material support—"training," "expert advice or assistance," "service," and "personnel." They raise three constitutional claims. First, plaintiffs claim that §2339B violates the Due Process Clause of the Fifth Amendment because these four statutory terms are impermissibly vague. Second,

plaintiffs claim that §2339B violates their freedom of speech under the First Amendment. Third, plaintiffs claim that §2339B violates their First Amendment freedom of association.

Plaintiffs do not challenge the above statutory terms in all their applications. Rather, plaintiffs claim that §2339B is invalid to the extent it prohibits them from engaging in certain specified activities. See Brief for Plaintiffs 16–17, n. 10. With respect to the HLP and Judge Fertig, those activities are: (1) "train[ing] members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes"; (2) "engag[ing] in political advocacy on behalf of Kurds who live in Turkey"; and (3) "teach[ing] PKK members how to petition various representative bodies such as the United Nations for relief." 552 F. 3d, at 921, n. 1; see 380 F. Supp. 2d, at 1136. With respect to the other plaintiffs, those activities are: (1) "train[ing] members of [the] LTTE to present claims for tsunami-related aid to mediators and international bodies"; (2) "offer[ing] their legal expertise in negotiating peace agreements between the LTTE and the Sri Lankan government"; and (3) "engag[ing] in political advocacy on behalf of Tamils who live in Sri Lanka." 552 F. 3d, at 921, n. 1; see 380 F. Supp. 2d, at 1137.

Plaintiffs also state that "the LTTE was recently defeated militarily in Sri Lanka," so "[m]uch of the support the Tamil organizations and Dr. Jeyalingam sought to provide is now moot." Brief for Plaintiffs 11, n. 5. Plaintiffs thus seek only to support the LTTE "as a political organization outside Sri Lanka advocating for the rights of Tamils." *Ibid.* Counsel for plaintiffs specifically stated at oral argument that plaintiffs no longer seek to teach the LTTE how to present claims for tsunami-related aid, because the LTTE now "has no role in Sri Lanka." Tr. of Oral Arg. 63. For that reason, helping the LTTE negotiate a peace agreement with Sri Lanka appears to be moot as

well.  Thus, we do not consider the application of §2339B to those activities here.

One last point.  Plaintiffs seek preenforcement review of a criminal statute.  Before addressing the merits, we must be sure that this is a justiciable case or controversy under Article III.  We conclude that it is: Plaintiffs face "a credible threat of prosecution" and "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979) (internal quotation marks omitted). See also *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 128–129 (2007).

Plaintiffs claim that they provided support to the PKK and the LTTE before the enactment of §2339B and that they would provide similar support again if the statute's allegedly unconstitutional bar were lifted.  See 309 F. Supp. 2d, at 1197.  The Government tells us that it has charged about 150 persons with violating §2339B, and that several of those prosecutions involved the enforcement of the statutory terms at issue here.  See Brief for Government 5.  The Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do.  Cf. Tr. of Oral Arg. 57–58.  See *Babbitt*, *supra*, at 302.  See also *Milavetz, Gallop & Milavetz, P. A.* v. *United States*, 559 U. S. ___, ___, ___ (2010) (slip op., at 4, 19) (considering an as-applied preenforcement challenge brought under the First Amendment). Based on these considerations, we conclude that plaintiffs' claims are suitable for judicial review (as one might hope after 12 years of litigation).

## III

Plaintiffs claim, as a threshold matter, that we should affirm the Court of Appeals without reaching any issues of constitutional law.  They contend that we should interpret the material-support statute, when applied to speech, to

require proof that a defendant intended to further a foreign terrorist organization's illegal activities. That interpretation, they say, would end the litigation because plaintiffs' proposed activities consist of speech, but plaintiffs do not intend to further unlawful conduct by the PKK or the LTTE.

We reject plaintiffs' interpretation of §2339B because it is inconsistent with the text of the statute. Section 2339B(a)(1) prohibits "knowingly" providing material support. It then specifically describes the type of knowledge that is required: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism. . . ." *Ibid.* Congress plainly spoke to the necessary mental state for a violation of §2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities.

Plaintiffs' interpretation is also untenable in light of the sections immediately surrounding §2339B, both of which do refer to intent to further terrorist activity. See §2339A(a) (establishing criminal penalties for one who "provides material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" statutes prohibiting violent terrorist acts); §2339C(a)(1) (setting criminal penalties for one who "unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" other unlawful acts). Congress enacted §2339A in 1994 and §2339C in 2002. See §120005(a), 108 Stat. 2022 (§2339A); §202(a), 116 Stat. 724 (§2339C). Yet Congress did not import the intent language of those provisions into §2339B, either when it

enacted §2339B in 1996, or when it clarified §2339B's knowledge requirement in 2004.

Finally, plaintiffs give the game away when they argue that a specific intent requirement should apply only when the material-support statute applies to speech. There is no basis whatever in the text of §2339B to read the same provisions in that statute as requiring intent in some circumstances but not others. It is therefore clear that plaintiffs are asking us not to interpret §2339B, but to revise it. "Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute." *Scales* v. *United States*, 367 U. S. 203, 211 (1961).

*Scales* is the case on which plaintiffs most heavily rely, but it is readily distinguishable. That case involved the Smith Act, which prohibited membership in a group advocating the violent overthrow of the government. The Court held that a person could not be convicted under the statute unless he had knowledge of the group's illegal advocacy and a specific intent to bring about violent overthrow. *Id.*, at 220–222, 229. This action is different: Section 2339B does not criminalize mere membership in a designated foreign terrorist organization. It instead prohibits providing "material support" to such a group. See *infra*, at 20–21, 35. Nothing about *Scales* suggests the need for a specific intent requirement in such a case. The Court in *Scales*, moreover, relied on both statutory text and precedent that had interpreted closely related provisions of the Smith Act to require specific intent. 367 U. S., at 209, 221–222. Plaintiffs point to nothing similar here.

We cannot avoid the constitutional issues in this litigation through plaintiffs' proposed interpretation of §2339B.[3]

_____

[3]The dissent would interpret the statute along the same lines as the plaintiffs, to prohibit speech and association "only when the defendant

## IV

We turn to the question whether the material-support statute, as applied to plaintiffs, is impermissibly vague under the Due Process Clause of the Fifth Amendment. "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U. S. 285, 304 (2008). We consider whether a statute is vague as applied to the particular facts at issue, for "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 495 (1982). We have said that when a statute "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.*, at 499. "But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Williams*, *supra*, at 304 (quoting *Ward* v. *Rock Against Racism*, 491 U. S. 781, 794 (1989)).

The Court of Appeals did not adhere to these principles. Instead, the lower court merged plaintiffs' vagueness challenge with their First Amendment claims, holding that portions of the material-support statute were uncon-

_____

knows or intends that those activities will assist the organization's unlawful terrorist actions." *Post*, at 17 (opinion of BREYER, J.). According to the dissent, this interpretation is "fairly possible" and adopting it would avoid constitutional concerns. *Ibid.* (internal quotation marks omitted). The dissent's interpretation of §2339B fails for essentially the same reasons as plaintiffs'. Congress explained what "knowingly" means in §2339B, and it did not choose the dissent's interpretation of that term. In fact, the dissent proposes a mental-state requirement indistinguishable from the one Congress adopted in §§2339A and 2339C, even though Congress used markedly different language in §2339B.

stitutionally vague because they applied to protected speech—regardless of whether those applications were clear. The court stated that, even if persons of ordinary intelligence understood the scope of the term "training," that term would "remai[n] impermissibly vague" because it could "be read to encompass speech and advocacy protected by the First Amendment." 552 F. 3d, at 929. It also found "service" and a portion of "expert advice or assistance" to be vague because those terms covered protected speech. *Id.*, at 929–930.

Further, in spite of its own statement that it was not addressing a "facial vagueness challenge," *id.*, at 929, n. 6, the Court of Appeals considered the statute's application to facts not before it. Specifically, the Ninth Circuit relied on the Government's statement that §2339B would bar filing an *amicus* brief in support of a foreign terrorist organization—which plaintiffs have not told us they wish to do, and which the Ninth Circuit did not say plaintiffs wished to do—to conclude that the statute barred protected advocacy and was therefore vague. See *id.*, at 930. By deciding how the statute applied in hypothetical circumstances, the Court of Appeals' discussion of vagueness seemed to incorporate elements of First Amendment overbreadth doctrine. See *id.*, at 929–930 (finding it "easy to imagine" protected expression that would be barred by §2339B (internal quotation marks omitted)); *id.*, at 930 (referring to both vagueness and overbreadth).

In both of these respects, the Court of Appeals contravened the rule that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates*, *supra*, at 495. That rule makes no exception for conduct in the form of speech. See *Parker* v. *Levy*, 417 U. S. 733, 755–757 (1974). Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a suc-

cessful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. Such a plaintiff may have a valid overbreadth claim under the First Amendment, but our precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression. See *Williams*, *supra*, at 304; *Hoffman Estates*, *supra*, at 494–495, 497. Otherwise the doctrines would be substantially redundant.

Under a proper analysis, plaintiffs' claims of vagueness lack merit. Plaintiffs do not argue that the material-support statute grants too much enforcement discretion to the Government. We therefore address only whether the statute "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U. S., at 304.

As a general matter, the statutory terms at issue here are quite different from the sorts of terms that we have previously declared to be vague. We have in the past "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.,* at 306; see also *Papachristou* v. *Jacksonville*, 405 U. S. 156, n. 1 (1972) (holding vague an ordinance that punished "vagrants," defined to include "rogues and vagabonds," "persons who use juggling," and "common night walkers" (internal quotation marks omitted)). Applying the statutory terms in this action—"training," "expert advice or assistance," "service," and "personnel"—does not require similarly untethered, subjective judgments.

Congress also took care to add narrowing definitions to the material-support statute over time. These definitions increased the clarity of the statute's terms. See §2339A(b)(2) ("'training' means instruction or teaching designed to impart a specific skill, as opposed to general

knowledge"); §2339A(b)(3) ("'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge"); §2339B(h) (clarifying the scope of "personnel"). And the knowledge requirement of the statute further reduces any potential for vagueness, as we have held with respect to other statutes containing a similar requirement. See *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000); *Posters 'N' Things, Ltd.* v. *United States*, 511 U. S. 513, 523, 526 (1994); see also *Hoffman Estates*, 455 U. S., at 499.

Of course, the scope of the material-support statute may not be clear in every application. But the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail. Even assuming that a heightened standard applies because the material-support statute potentially implicates speech, the statutory terms are not vague as applied to plaintiffs. See *Grayned* v. *City of Rockford*, 408 U. S. 104, 114–115 (1972) (rejecting a vagueness challenge to a criminal law that implicated First Amendment activities); *Scales*, 367 U. S., at 223 (same).

Most of the activities in which plaintiffs seek to engage readily fall within the scope of the terms "training" and "expert advice or assistance." Plaintiffs want to "train members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes," and "teach PKK members how to petition various representative bodies such as the United Nations for relief." 552 F. 3d, at 921, n. 1. A person of ordinary intelligence would understand that instruction on resolving disputes through international law falls within the statute's definition of "training" because it imparts a "specific skill," not "general knowledge." §2339A(b)(2). Plaintiffs' activities also fall comfortably within the scope of "expert advice or assistance": A reasonable person would recognize that teaching

the PKK how to petition for humanitarian relief before the United Nations involves advice derived from, as the statute puts it, "specialized knowledge." §2339A(b)(3). In fact, plaintiffs themselves have repeatedly used the terms "training" and "expert advice" throughout this litigation to describe their own proposed activities, demonstrating that these common terms readily and naturally cover plaintiffs' conduct. See, *e.g.,* Brief for Plaintiffs 10, 11; App. 56, 58, 59, 61, 62, 63, 80, 81, 98, 99, 106, 107, 117.

Plaintiffs respond by pointing to hypothetical situations designed to test the limits of "training" and "expert advice or assistance." They argue that the statutory definitions of these terms use words of degree—like "specific," "general," and "specialized"—and that it is difficult to apply those definitions in particular cases. See Brief for Plaintiffs 27 (debating whether teaching a course on geography would constitute training); *id.*, at 29. And they cite *Gentile* v. *State Bar of Nev.*, 501 U. S. 1030 (1991), in which we found vague a state bar rule providing that a lawyer in a criminal case, when speaking to the press, "may state without elaboration . . . the general nature of the . . . defense." *Id.*, at 1048 (internal quotation marks omitted).

Whatever force these arguments might have in the abstract, they are beside the point here. Plaintiffs do not propose to teach a course on geography, and cannot seek refuge in imaginary cases that straddle the boundary between "specific skills" and "general knowledge." See *Parker* v. *Levy*, 417 U. S., at 756. We emphasized this point in *Scales*, holding that even if there might be theoretical doubts regarding the distinction between "active" and "nominal" membership in an organization—also terms of degree—the defendant's vagueness challenge failed because his "case present[ed] no such problem." 367 U. S., at 223.

*Gentile* was different. There the asserted vagueness in a state bar rule was directly implicated by the facts before

the Court: Counsel had reason to suppose that his particular statements to the press would not violate the rule, yet he was disciplined nonetheless. See 501 U. S., at 1049–1051. We did not suggest that counsel could escape discipline on vagueness grounds if his own speech were plainly prohibited.

Plaintiffs also contend that they want to engage in "political advocacy" on behalf of Kurds living in Turkey and Tamils living in Sri Lanka. 552 F. 3d, at 921, n. 1. They are concerned that such advocacy might be regarded as "material support" in the form of providing "personnel" or "service[s]," and assert that the statute is unconstitutionally vague because they cannot tell.

As for "personnel," Congress enacted a limiting definition in IRTPA that answers plaintiffs' vagueness concerns. Providing material support that constitutes "personnel" is defined as knowingly providing a person "to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization." §2339B(h). The statute makes clear that "personnel" does not cover *independent* advocacy: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Ibid.*

"[S]ervice" similarly refers to concerted activity, not independent advocacy. See Webster's Third New International Dictionary 2075 (1993) (defining "service" to mean "the performance of work commanded or paid for by another: a servant's duty: attendance on a superior"; or "an act done for the benefit or at the command of another"). Context confirms that ordinary meaning here. The statute prohibits providing a service "*to* a foreign terrorist organization." §2339B(a)(1) (emphasis added). The use of the word "to" indicates a connection between the service and

the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause.

Moreover, if independent activity in support of a terrorist group could be characterized as a "service," the statute's specific exclusion of independent activity in the definition of "personnel" would not make sense. Congress would not have prohibited under "service" what it specifically exempted from prohibition under "personnel." The other types of material support listed in the statute, including "lodging," "weapons," "explosives," and "transportation," §2339A(b)(1), are not forms of support that could be provided independently of a foreign terrorist organization. We interpret "service" along the same lines. Thus, any independent advocacy in which plaintiffs wish to engage is not prohibited by §2339B. On the other hand, a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.

Plaintiffs argue that this construction of the statute poses difficult questions of exactly how much direction or coordination is necessary for an activity to constitute a "service." See Reply Brief for Petitioners in No. 09–89, p. 14 (hereinafter Reply Brief for Plaintiffs) ("Would any communication with any member be sufficient? With a leader? Must the 'relationship' have any formal elements, such as an employment or contractual relationship? What about a relationship through an intermediary?"). The problem with these questions is that they are entirely hypothetical. Plaintiffs have not provided any specific articulation of the degree to which *they* seek to coordinate their advocacy with the PKK and the LTTE. They have instead described the form of their intended advocacy only in the most general terms. See, *e.g.,* Brief for Plaintiffs 10–11 (plaintiffs "would like, among other things, to offer

their services to advocate on behalf of the rights of the
Kurdish people and the PKK before the United Nations
and the United States Congress" (internal quotation
marks and alteration omitted)); App. 59 (plaintiffs would
like to "write and distribute publications supportive of the
PKK and the cause of Kurdish liberation" and "advocate
for the freedom of political prisoners in Turkey").

Deciding whether activities described at such a level of
generality would constitute prohibited "service[s]" under
the statute would require "sheer speculation"—which
means that plaintiffs cannot prevail in their preenforce-
ment challenge. See *Washington State Grange* v. *Wash-
ington State Republican Party*, 552 U. S. 442, 454 (2008).
It is apparent with respect to these claims that "grada-
tions of fact or charge would make a difference as to
criminal liability," and so "adjudication of the reach and
constitutionality of [the statute] must await a concrete fact
situation." *Zemel* v. *Rusk*, 381 U. S. 1, 20 (1965).



V

A

We next consider whether the material-support statute,
as applied to plaintiffs, violates the freedom of speech
guaranteed by the First Amendment. Both plaintiffs and
the Government take extreme positions on this question.
Plaintiffs claim that Congress has banned their "pure
political speech." *E.g.,* Brief for Plaintiffs 2, 25, 43. It has
not. Under the material-support statute, plaintiffs may
say anything they wish on any topic. They may speak and
write freely about the PKK and LTTE, the governments of
Turkey and Sri Lanka, human rights, and international
law. They may advocate before the United Nations. As
the Government states: "The statute does not prohibit
independent advocacy or expression of any kind." Brief for
Government 13. Section 2339B also "does not prevent
[plaintiffs] from becoming members of the PKK and LTTE

or impose any sanction on them for doing so." *Id.*, at 60. Congress has not, therefore, sought to suppress ideas or opinions in the form of "pure political speech." Rather, Congress has prohibited "material support," which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.[4]

For its part, the Government takes the foregoing too far, claiming that the only thing truly at issue in this litigation is conduct, not speech. Section 2339B is directed at the fact of plaintiffs' interaction with the PKK and LTTE, the Government contends, and only incidentally burdens their expression. The Government argues that the proper standard of review is therefore the one set out in *United States* v. *O'Brien*, 391 U. S. 367 (1968). In that case, the Court rejected a First Amendment challenge to a conviction under a generally applicable prohibition on destroying draft cards, even though O'Brien had burned his card in protest against the draft. See *id.*, at 370, 376, 382. In so doing, we applied what we have since called "intermediate scrutiny," under which a "content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 189 (1997) (citing *O'Brien*, *supra*, at 377).

The Government is wrong that the only thing actually at

––––––––––

[4] The dissent also analyzes the statute as if it prohibited "[p]eaceful political advocacy" or "pure speech and association," without more. *Post*, at 9, 17. Section 2339B does not do that, and we do not address the constitutionality of any such prohibitions. The dissent's claim that our decision is inconsistent with this Court's cases analyzing those sorts of restrictions, *post*, at 11–12, is accordingly unfounded.

issue in this litigation is conduct, and therefore wrong to argue that *O'Brien* provides the correct standard of review.[5] *O'Brien* does not provide the applicable standard for reviewing a content-based regulation of speech, see *R. A. V.* v. *St. Paul*, 505 U. S. 377, 385–386 (1992); *Texas* v. *Johnson*, 491 U. S. 397, 403, 406–407 (1989), and §2339B regulates speech on the basis of its content. Plaintiffs want to speak to the PKK and the LTTE, and whether they may do so under §2339B depends on what they say. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge"—for example, training on the use of international law or advice on petitioning the United Nations— then it is barred. See Brief for Government 33–34. On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge. See *id.*, at 32.

The Government argues that §2339B should nonetheless receive intermediate scrutiny because it *generally* functions as a regulation of conduct. That argument runs headlong into a number of our precedents, most prominently *Cohen* v. *California*, 403 U. S. 15 (1971). *Cohen* also involved a generally applicable regulation of conduct, barring breaches of the peace. See *id.*, at 16. But when Cohen was convicted for wearing a jacket bearing an epithet, we did not apply *O'Brien.* See 403 U. S., at 16, 18. Instead, we recognized that the generally applicable law

_____

[5] The Government suggests in passing that, to the extent plaintiffs' activities constitute speech, that speech is wholly unprotected by the First Amendment. The Government briefly analogizes speech coordinated with foreign terrorist organizations to speech effecting a crime, like the words that constitute a conspiracy. Brief for Government 46; Reply Brief for Government 31–32, and n. 8. See, *e.g., Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 498, 502 (1949). We do not consider any such argument because the Government does not develop it: The Government's submission is that applying §2339B to plaintiffs triggers intermediate First Amendment scrutiny—not that it triggers no First Amendment scrutiny at all.

was directed at Cohen because of what his speech communicated—he violated the breach of the peace statute because of the offensive content of his particular message. We accordingly applied more rigorous scrutiny and reversed his conviction. See *id.*, at 18–19, 26.

This suit falls into the same category. The law here may be described as directed at conduct, as the law in *Cohen* was directed at breaches of the peace, but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message. As we explained in *Texas* v. *Johnson*: "If the [Government's] regulation is not related to expression, then the less stringent standard we announced in *United States* v. *O'Brien* for regulations of noncommunicative conduct controls. If it is, then we are outside of *O'Brien*'s test, and we must [apply] a more demanding standard." 491 U. S., at 403 (citation omitted).

## B

The First Amendment issue before us is more refined than either plaintiffs or the Government would have it. It is not whether the Government may prohibit pure political speech, or may prohibit material support in the form of conduct. It is instead whether the Government may prohibit what plaintiffs want to do—provide material support to the PKK and LTTE in the form of speech.

Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order. See Brief for Plaintiffs 51. Plaintiffs' complaint is that the ban on material support, applied to what they wish to do, is not "necessary to further that interest." *Ibid.* The objective of combating terrorism does not justify prohibiting their speech, plaintiffs argue, because their support will advance only the legitimate activities of the designated terrorist organizations, not their terrorism. *Id.*, at 51–52.

Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question. When it enacted §2339B in 1996, Congress made specific findings regarding the serious threat posed by international terrorism. See AEDPA §§301(a)(1)–(7), 110 Stat. 1247, note following 18 U. S. C. §2339B (Findings and Purpose). One of those findings explicitly rejects plaintiffs' contention that their support would not further the terrorist activities of the PKK and LTTE: "[F]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct." §301(a)(7) (emphasis added).

Plaintiffs argue that the reference to "any contribution" in this finding meant only monetary support. There is no reason to read the finding to be so limited, particularly because Congress expressly prohibited so much more than monetary support in §2339B. Congress's use of the term "contribution" is best read to reflect a determination that any form of material support furnished "to" a foreign terrorist organization should be barred, which is precisely what the material-support statute does. Indeed, when Congress enacted §2339B, Congress simultaneously removed an exception that had existed in §2339A(a) (1994 ed.) for the provision of material support in the form of "humanitarian assistance to persons not directly involved in" terrorist activity. AEDPA §323, 110 Stat. 1255; 205 F. 3d, at 1136. That repeal demonstrates that Congress considered and rejected the view that ostensibly peaceful aid would have no harmful effects.

We are convinced that Congress was justified in rejecting that view. The PKK and the LTTE are deadly groups. "The PKK's insurgency has claimed more than 22,000 lives." Declaration of Kenneth R. McKune, App. 128, ¶5. The LTTE has engaged in extensive suicide bombings and political assassinations, including killings of the Sri

Lankan President, Security Minister, and Deputy Defense Minister. *Id.*, at 130–132; Brief for Government 6–7. "On January 31, 1996, the LTTE exploded a truck bomb filled with an estimated 1,000 pounds of explosives at the Central Bank in Colombo, killing 100 people and injuring more than 1,400. This bombing was the most deadly terrorist incident in the world in 1996." McKune Affidavit, App. 131, ¶6.h. It is not difficult to conclude as Congress did that the "tain[t]" of such violent activities is so great that working in coordination with or at the command of the PKK and LTTE serves to legitimize and further their terrorist means. AEDPA §301(a)(7), 110 Stat. 1247.

Material support meant to "promot[e] peaceable, lawful conduct," Brief for Plaintiffs 51, can further terrorism by foreign groups in multiple ways. "Material support" is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks. "Terrorist organizations do not maintain *organizational* 'firewalls' that would prevent or deter . . . sharing and commingling of support and benefits." McKune Affidavit, App. 135, ¶11. "[I]nvestigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts." M. Levitt, Hamas: Politics, Charity, and Terrorism in the Service of Jihad 2–3 (2006). "Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." McKune Affidavit, App. 135, ¶11; Levitt, *supra*, at 2 ("Muddying the waters between its political activism, good works, and terrorist attacks,

Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations").

Money is fungible, and "[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put." McKune Affidavit, App. 134, ¶9. But "there is reason to believe that foreign terrorist organizations do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." *Id.*, at 135, ¶12. Thus, "[f]unds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives." *Id.*, at 134, ¶10. See also Brief for Anti-Defamation League as *Amicus Curiae* 19–29 (describing fundraising activities by the PKK, LTTE, and Hamas); *Regan* v. *Wald*, 468 U. S. 222, 243 (1984) (upholding President's decision to impose travel ban to Cuba "to curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban adventurism"). There is evidence that the PKK and the LTTE, in particular, have not "respected the line between humanitarian and violent activities." McKune Affidavit, App. 135, ¶13 (discussing PKK); see *id.*, at 134 (LTTE).

The dissent argues that there is "no natural stopping place" for the proposition that aiding a foreign terrorist organization's lawful activity promotes the terrorist organization as a whole. *Post*, at 10. But Congress has settled on just such a natural stopping place: The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization. Independent advocacy that might be viewed as promoting the group's legitimacy is not covered. See *supra*, at 18–

21.[6]

Providing foreign terrorist groups with material support in any form also furthers terrorism by straining the United States' relationships with its allies and undermining cooperative efforts between nations to prevent terrorist attacks. We see no reason to question Congress's finding that "international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts, including hostage taking, murder of an internationally protected person, and aircraft piracy and sabotage." AEDPA §301(a)(5), 110 Stat. 1247, note following 18 U. S. C. §2339B (Findings and Purpose). The material-support statute furthers this international effort by prohibiting aid for foreign terrorist groups that harm the United States' partners abroad: "A number of designated foreign terrorist organizations have attacked moderate governments with which the United States has vigorously endeavored to maintain close and friendly relations," and those attacks "threaten [the] social, economic and political stability" of such governments. McKune Affidavit, App. 137, ¶16. "[O]ther foreign terrorist organizations attack our NATO allies, thereby implicating important and sensitive multilateral security arrangements." *Ibid.*

For example, the Republic of Turkey—a fellow member of NATO—is defending itself against a violent insurgency

_____

[6] The dissent also contends that the particular sort of material support plaintiffs seek to provide cannot be diverted to terrorist activities, in the same direct way as funds or goods. *Post*, at 8–9. This contention misses the point. Both common sense and the evidence submitted by the Government make clear that material support of a terrorist group's lawful activities facilitates the group's ability to attract "funds," "financing," and "goods" that will further its terrorist acts. See McKune Affidavit, App. 134–136.

waged by the PKK. Brief for Government 6; App. 128. That nation and our other allies would react sharply to Americans furnishing material support to foreign groups like the PKK, and would hardly be mollified by the explanation that the support was meant only to further those groups' "legitimate" activities. From Turkey's perspective, there likely are no such activities. See 352 F. 3d, at 389 (observing that Turkey prohibits membership in the PKK and prosecutes those who provide support to that group, regardless of whether the support is directed to lawful activities).

C

In analyzing whether it is possible in practice to distinguish material support for a foreign terrorist group's violent activities and its nonviolent activities, we do not rely exclusively on our own inferences drawn from the record evidence. We have before us an affidavit stating the Executive Branch's conclusion on that question. The State Department informs us that "[t]he experience and analysis of the U. S. government agencies charged with combating terrorism strongly suppor[t]" Congress's finding that all contributions to foreign terrorist organizations further their terrorism. McKune Affidavit, App. 133, ¶8. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. ___, ___ (2008) (slip op., at 14–15) (looking to similar affidavits to support according weight to national security claims). In the Executive's view: "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions— regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." McKune Affidavit, App. 133, ¶8.

That evaluation of the facts by the Executive, like Con-

gress's assessment, is entitled to deference. This litigation implicates sensitive and weighty interests of national security and foreign affairs. The PKK and the LTTE have committed terrorist acts against American citizens abroad, and the material-support statute addresses acute foreign policy concerns involving relationships with our Nation's allies. See *id.*, at 128–133, 137. We have noted that "neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene* v. *Bush*, 553 U. S. 723, 797 (2008). It is vital in this context "not to substitute . . . our own evaluation of evidence for a reasonable evaluation by the Legislative Branch." *Rostker* v. *Goldberg*, 453 U. S. 57, 68 (1981). See *Wald*, 468 U. S., at 242; *Haig* v. *Agee*, 453 U. S. 280, 292 (1981).

Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake. We are one with the dissent that the Government's "authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals." *Post*, at 23. But when it comes to collecting evidence and drawing factual inferences in this area, "the lack of competence on the part of the courts is marked," *Rostker*, *supra*, at 65, and respect for the Government's conclusions is appropriate.

One reason for that respect is that national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess. The dissent slights these real constraints in demanding hard proof—with "detail," "specific facts," and "specific evidence"—that plaintiffs' proposed activities will support terrorist attacks. See *post*, at 9, 16,

23. That would be a dangerous requirement. In this context, conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government. The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur. The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions. See *Zemel* v. *Rusk*, 381 U. S., at 17 ("[B]ecause of the changeable and explosive nature of contemporary international relations, . . . Congress . . . must of necessity paint with a brush broader than that it customarily wields in domestic areas").

This context is different from that in decisions like *Cohen.* In that case, the application of the statute turned on the offensiveness of the speech at issue. Observing that "one man's vulgarity is another's lyric," we invalidated Cohen's conviction in part because we concluded that "governmental officials cannot make principled distinctions in this area." 403 U. S., at 25. In this litigation, by contrast, Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not.

We also find it significant that Congress has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns. First, §2339B only applies to designated foreign terrorist organizations. There is, and always has been, a limited number of those organizations designated by the Executive Branch, see, *e.g.,* 74 Fed. Reg. 29742 (2009); 62 Fed. Reg. 52650 (1997), and any groups so designated may seek judicial review of the designation. Second, in response to the lower courts'

holdings in this litigation, Congress added clarity to the statute by providing narrowing definitions of the terms "training," "personnel," and "expert advice or assistance," as well as an explanation of the knowledge required to violate §2339B. Third, in effectuating its stated intent not to abridge First Amendment rights, see §2339B(i), Congress has also displayed a careful balancing of interests in creating limited exceptions to the ban on material support. The definition of material support, for example, excludes medicine and religious materials. See §2339A(b)(1). In this area perhaps more than any other, the Legislature's superior capacity for weighing competing interests means that "we must be particularly careful not to substitute our judgment of what is desirable for that of Congress." *Rostker*, *supra*, at 68. Finally, and most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups.

At bottom, plaintiffs simply disagree with the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization. That judgment, however, is entitled to significant weight, and we have persuasive evidence before us to sustain it. Given the sensitive interests in national security and foreign affairs at stake, the political branches have adequately substantiated their determination that, to serve the Government's interest in preventing terrorism, it was necessary to prohibit providing material support in the form of training, expert advice, personnel, and services to foreign terrorist groups, even if the supporters meant to promote only the groups' nonviolent ends.

We turn to the particular speech plaintiffs propose to undertake. First, plaintiffs propose to "train members of [the] PKK on how to use humanitarian and international

law to peacefully resolve disputes." 552 F. 3d, at 921, n. 1. Congress can, consistent with the First Amendment, prohibit this direct training. It is wholly foreseeable that the PKK could use the "specific skill[s]" that plaintiffs propose to impart, §2339A(b)(2), as part of a broader strategy to promote terrorism. The PKK could, for example, pursue peaceful negotiation as a means of buying time to recover from short-term setbacks, lulling opponents into complacency, and ultimately preparing for renewed attacks. See generally A. Marcus, Blood and Belief: The PKK and the Kurdish Fight for Independence 286–295 (2007) (describing the PKK's suspension of armed struggle and subsequent return to violence). A foreign terrorist organization introduced to the structures of the international legal system might use the information to threaten, manipulate, and disrupt. This possibility is real, not remote.

Second, plaintiffs propose to "teach PKK members how to petition various representative bodies such as the United Nations for relief." 552 F. 3d, at 921, n. 1. The Government acts within First Amendment strictures in banning this proposed speech because it teaches the organization how to acquire "relief," which plaintiffs never define with any specificity, and which could readily include monetary aid. See Brief for Plaintiffs 10–11, 16–17, n. 10; App. 58–59, 80–81. Indeed, earlier in this litigation, plaintiffs sought to teach the LTTE "to present claims for tsunami-related aid to mediators and international bodies," 552 F. 3d, at 921, n. 1, which naturally included monetary relief. Money is fungible, *supra*, at 26, and Congress logically concluded that money a terrorist group such as the PKK obtains using the techniques plaintiffs propose to teach could be redirected to funding the group's violent activities.

Finally, plaintiffs propose to "engage in political advocacy on behalf of Kurds who live in Turkey," and "engage

in political advocacy on behalf of Tamils who live in Sri Lanka." 552 F. 3d, at 921, n. 1. As explained above, *supra*, at 19–20, plaintiffs do not specify their expected level of coordination with the PKK or LTTE or suggest what exactly their "advocacy" would consist of. Plaintiffs' proposals are phrased at such a high level of generality that they cannot prevail in this preenforcement challenge. See *supra*, at 20; *Grange*, 552 U. S., at 454; *Zemel*, 381 U. S., at 20.

In responding to the foregoing, the dissent fails to address the real dangers at stake. It instead considers only the possible benefits of plaintiffs' proposed activities in the abstract. See *post*, at 13–15. The dissent seems unwilling to entertain the prospect that training and advising a designated foreign terrorist organization on how to take advantage of international entities might benefit that organization in a way that facilitates its terrorist activities. In the dissent's world, such training is all to the good. Congress and the Executive, however, have concluded that we live in a different world: one in which the designated foreign terrorist organizations "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA §301(a)(7). One in which, for example, "the United Nations High Commissioner for Refugees was forced to close a Kurdish refugee camp in northern Iraq because the camp had come under the control of the PKK, and the PKK had failed to respect its 'neutral and humanitarian nature.'" McKune Affidavit, App. 135–136, ¶13. Training and advice on how to work with the United Nations could readily have helped the PKK in its efforts to use the United Nations camp as a base for terrorist activities.

If only good can come from training our adversaries in international dispute resolution, presumably it would have been unconstitutional to prevent American citizens from training the Japanese Government on using interna-

tional organizations and mechanisms to resolve disputes during World War II. It would, under the dissent's reasoning, have been contrary to our commitment to resolving disputes through "'deliberative forces,'" *post*, at 13 (quoting *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring)), for Congress to conclude that assisting Japan on that front might facilitate its war effort more generally. That view is not one the First Amendment requires us to embrace.

All this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny. It is also not to say that any other statute relating to speech and terrorism would satisfy the First Amendment. In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations. We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations. We simply hold that, in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, §2339B does not violate the freedom of speech.

## VI

Plaintiffs' final claim is that the material-support statute violates their freedom of association under the First Amendment. Plaintiffs argue that the statute criminalizes the mere fact of their associating with the PKK and the LTTE, thereby running afoul of decisions like *De Jonge* v. *Oregon*, 299 U. S. 353 (1937), and cases in which we have overturned sanctions for joining the Communist Party, see, *e.g., Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589 (1967); *United States* v. *Robel*, 389 U. S. 258 (1967).

The Court of Appeals correctly rejected this claim be-

cause the statute does not penalize mere association with a foreign terrorist organization. As the Ninth Circuit put it: "The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. . . . What [§2339B] prohibits is the act of giving material support . . . ." 205 F. 3d, at 1133. Plaintiffs want to do the latter. Our decisions scrutinizing penalties on simple association or assembly are therefore inapposite. See, *e.g., Robel*, *supra*, at 262 ("It is precisely because th[e] statute sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership, that it runs afoul of the First Amendment"); *De Jonge*, *supra*, at 362.

Plaintiffs also argue that the material-support statute burdens their freedom of association because it prevents them from providing support to designated foreign terrorist organizations, but not to other groups. See Brief for Plaintiffs 56; Reply Brief for Plaintiffs 37–38. Any burden on plaintiffs' freedom of association in this regard is justified for the same reasons that we have denied plaintiffs' free speech challenge. It would be strange if the Constitution permitted Congress to prohibit certain forms of speech that constitute material support, but did not permit Congress to prohibit that support only to particularly dangerous and lawless foreign organizations. Congress is not required to ban material support to every group or none at all.

\*    \*    \*

The Preamble to the Constitution proclaims that the people of the United States ordained and established that charter of government in part to "provide for the common defence." As Madison explained, "[s]ecurity against foreign danger is . . . an avowed and essential object of the American Union." The Federalist No. 41, p. 269 (J. Cooke

ed. 1961). We hold that, in regulating the particular forms of support that plaintiffs seek to provide to foreign terrorist organizations, Congress has pursued that objective consistent with the limitations of the First and Fifth Amendments.

The judgment of the United States Court of Appeals for the Ninth Circuit is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 08–1498 and 09–89

_____

ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.,
PETITIONERS
08–1498                    *v.*
HUMANITARIAN LAW PROJECT ET AL.


HUMANITARIAN LAW PROJECT, ET AL.,
PETITIONERS
09–89                    *v.*
ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 21, 2010]

JUSTICE BREYER, with whom JUSTICES GINSBURG and SOTOMAYOR join, dissenting.

Like the Court, and substantially for the reasons it gives, I do not think this statute is unconstitutionally vague. But I cannot agree with the Court's conclusion that the Constitution permits the Government to prosecute the plaintiffs criminally for engaging in coordinated teaching and advocacy furthering the designated organizations' lawful political objectives. In my view, the Government has not met its burden of showing that an interpretation of the statute that would prohibit this speech- and association-related activity serves the Government's compelling interest in combating terrorism. And I would interpret the statute as normally placing activity of this kind outside its scope. See *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring).

## I

The statute before us forbids "knowingly provid[ing]" "a foreign terrorist organization" with "material support or resources," defined to include, among other things, "training," "expert advice or assistance," "personnel," and "service."  18 U. S. C. §§2339B(a)(1), (g)(4); §2339A(b)(1).  The Secretary of State has designated the Kurdistan Workers' Party (PKK) and the Liberation Tigers of Tamil Eelam (LTTE) as "foreign terrorist organizations"—a designation authorized where the organization is "foreign," threatens the security of the United States or its nationals, and engages in "terrorist activity," defined to include "any" of such activities as "highjacking" and "assassination," or the "use of . . . any . . . weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals."  62 Fed. Reg. 52650 (1997); 8 U. S. C. §1182(a)(3)(B)(iii); 18 U. S. C. §2339B(a)(1).

The plaintiffs, all United States citizens or associations, now seek an injunction and declaration providing that, without violating the statute, they can (1) "train members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes"; (2) "engage in political advocacy on behalf of Kurds who live in Turkey"; (3) "teach PKK members how to petition various representative bodies such as the United Nations for relief"; and (4) "engage in political advocacy on behalf of Tamils who live in Sri Lanka." *Humanitarian Law Project* v. *Mukasey*, 552 F. 3d 916, 921, n. 1 (CA9 2009); *ante*, at 9.  All these activities are of a kind that the First Amendment ordinarily protects.

In my view, the Government has not made the strong showing necessary to justify under the First Amendment the criminal prosecution of those who engage in these activities.  All the activities involve the communication and advocacy of political ideas and lawful means of achieving political ends.  Even the subjects the plaintiffs wish to

teach—using international law to resolve disputes peacefully or petitioning the United Nations, for instance—concern political speech. We cannot avoid the constitutional significance of these facts on the basis that some of this speech takes place outside the United States and is directed at foreign governments, for the activities also involve advocacy in *this* country directed to *our* government and *its* policies. The plaintiffs, for example, wish to write and distribute publications and to speak before the United States Congress. App. 58–59.

That this speech and association for political purposes is the *kind* of activity to which the First Amendment ordinarily offers its strongest protection is elementary. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269 (1964) (The First Amendment "'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people'" (quoting *Roth* v. *United States*, 354 U. S. 476, 484 (1957)); *Lovell* v. *City of Griffin*, 303 U. S. 444, 452 (1938) (rejecting licensing scheme for distribution of "pamphlets and leaflets," "historic weapons in the defense of liberty"); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 422 (1992) (STEVENS, J., concurring in judgment) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech" in which "[c]ore political speech occupies the highest, most protected position"); *Hill* v. *Colorado*, 530 U. S. 703, 787 (2000) (KENNEDY, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against"); *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___, ___ (2010) (slip op., at 33) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech").

Although in the Court's view the statute applies only

where the PKK helps to coordinate a defendant's activities, *ante*, at 21, the simple fact of "coordination" alone cannot readily remove protection that the First Amendment would otherwise grant.  That amendment, after all, also protects the freedom of association.  See *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 911 (1982) (The First Amendment's protections "of speech, assembly, association, and petition, 'though not identical, are inseparable'" (quoting *Thomas* v. *Collins*, 323 U. S. 516, 530 (1945))); *De Jonge* v. *Oregon*, 299 U. S. 353, 364 (1937) (describing the "right of peaceable assembly" as "a right cognate to those of free speech and free presses and . . . equally fundamental"); see also *Roberts* v. *United States Jaycees*, 468 U. S. 609, 622 (1984).  "Coordination" with a political group, like membership, involves association.

"Coordination" with a group that engages in unlawful activity also does not deprive the plaintiffs of the First Amendment's protection under any traditional "categorical" exception to its protection.  The plaintiffs do not propose to solicit a crime.  They will not engage in fraud or defamation or circulate obscenity.  Cf. *United States* v. *Stevens*, 559 U. S. ___ , ___ (2010) (slip op., at 5–6) (describing "categories" of unprotected speech).  And the First Amendment protects advocacy even of *unlawful* action so long as that advocacy is not "directed to inciting or producing *imminent lawless action* and . . . *likely to incite or produce* such action."  *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)* (emphasis added).  Here the plaintiffs seek to advocate peaceful, *lawful* action to secure *political* ends; and they seek to teach others how to do the same.  No one contends that the plaintiffs' speech to these organizations can be prohibited as incitement under *Brandenburg*.

Moreover, the Court has previously held that a person who associates with a group that uses unlawful means to achieve its ends does not thereby necessarily forfeit the

First Amendment's protection for freedom of association. See *Scales* v. *United States*, 367 U. S. 203, 229 (1961) ("[Q]uasi-political parties or other groups that may embrace both legal and illegal aims differ from a technical conspiracy, which is defined by its criminal purpose"); see also *NAACP*, *supra*, at 908 ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected"). Rather, the Court has pointed out in respect to associating with a group advocating overthrow of the Government through force and violence: "If the persons assembling have committed crimes elsewhere . . . , they may be prosecuted for their . . . violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge." *De Jonge, supra*, at 365 (striking down conviction for attending and assisting at Communist Party meeting because "[n]otwithstanding [the party's] objectives, the defendant still enjoyed his personal right of free speech and to take part in peaceable assembly having a lawful purpose").

Not even the "serious and deadly problem" of international terrorism can require *automatic* forfeiture of First Amendment rights. §301(a)(1), 110 Stat. 1247, note following 18 U. S. C. §2339B. Cf. §2339B(i) (instructing courts not to "constru[e] or appl[y the statute] so as to abridge the exercise of right guaranteed under the First Amendment"). After all, this Court has recognized that not "'[e]ven the war power . . . remove[s] constitutional limitations safeguarding essential liberties.'" *United States* v. *Robel*, 389 U. S. 258, 264 (1967) (quoting *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 426 (1934)). See also *Abrams* v. *United States*, 250 U. S. 616, 628 (1919) (Holmes, J., dissenting) ("[A]s against dangers

peculiar to war, as against others, the principle of the right to free speech is always the same"). Thus, there is no general First Amendment exception that applies here. If the statute is constitutional in this context, it would have to come with a strong justification attached.

It is not surprising that the majority, in determining the constitutionality of criminally prohibiting the plaintiffs' proposed activities, would apply, not the kind of intermediate First Amendment standard that applies to conduct, but "'a more demanding standard.'" *Ante,* at 23 (quoting *Texas* v. *Johnson,* 491 U. S. 397, 403 (1989)). Indeed, where, as here, a statute applies criminal penalties and at least arguably does so on the basis of content-based distinctions, I should think we would scrutinize the statute and justifications "strictly"—to determine whether the prohibition is justified by a "compelling" need that cannot be "less restrictively" accommodated. See *Houston* v. *Hill,* 482 U. S. 451, 459 (1987) (criminal penalties); *Ashcroft* v. *American Civil Liberties Union,* 535 U. S. 564, 573 (2002) (content-based); *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 118 (1991) (same); *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 530, 540 (1980) (strict scrutiny); *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 786 (1978) (same).

But, even if we assume for argument's sake that "strict scrutiny" does not apply, no one can deny that we must at the very least "measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment." *Robel, supra,* 268, n. 20 (describing constitutional task where the Court is faced "with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights"). And here I need go no further, for I doubt that the statute, as the Government would interpret it, can

survive any reasonably applicable First Amendment standard. See, *e.g., Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 189 (1997) (describing intermediate scrutiny). Cf. *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring) (examining whether a statute worked speech-related harm "out of proportion to the statute's salutary effects upon" other interests).

The Government does identify a compelling countervailing interest, namely, the interest in protecting the security of the United States and its nationals from the threats that foreign terrorist organizations pose by denying those organizations financial and other fungible resources. I do not dispute the importance of this interest. But I do dispute whether the interest can justify the statute's criminal prohibition. To put the matter more specifically, precisely how does application of the statute to the protected activities before us *help achieve* that important security-related end? See *Simon & Schuster,* 502 U. S., at 118 (requiring that "narrowly drawn" means further a "compelling state interest" by the least restrictive means (internal quotation marks omitted)); *Turner, supra*, at 189 (requiring "advance[ment of] important governmental interests unrelated to the suppression of free speech" without "burden[ing] substantially more speech than necessary to further those interests"); *Robel, supra,* at 268, n. 20 (requiring measurement of the "means adopted by Congress against . . . the [security] goal it has sought to achieve"). See also *Nixon*, 528 U. S., at 402 (BREYER, J., concurring); *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, 478 (2007) (opinion of ROBERTS, C. J.) ("A court . . . must ensure that [the interest justifying a statutory restriction] supports *each application* of [the] statute").

The Government makes two efforts to answer this ques-

tion.  *First*, the Government says that the plaintiffs' support for these organizations is "fungible" in the same sense as other forms of banned support.  Being fungible, the plaintiffs' support could, for example, free up other resources, which the organization might put to terrorist ends.  Brief for Respondents in No. 09–89, pp. 54–56 (hereinafter Government Brief).

The proposition that the two very different kinds of "support" are "fungible," however, is not *obviously* true.  There is no *obvious* way in which undertaking advocacy for political change through peaceful means or teaching the PKK and LTTE, say, how to petition the United Nations for political change is fungible with other resources that might be put to more sinister ends in the way that donations of money, food, or computer training are fungible.  It is far from obvious that these advocacy activities can themselves be redirected, or will free other resources that can be directed, towards terrorist ends.  Thus, we must determine whether the Government has come forward with evidence to support its claim.

The Government has provided us with no empirical information that might convincingly support this claim.  Instead, the Government cites only to evidence that Congress was concerned about the "fungible" nature in general of resources, predominately money and material goods.  It points to a congressional finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any *contribution* to such an organization facilitates that conduct."  §301(a)(7), 110 Stat. 1247, note following 18 U. S. C. §2339B (emphasis added).  It also points to a House Report's statement that "supply[ing] *funds*, *goods*, or *services*" would "hel[p] defray the cost to the terrorist organization of running the ostensibly legitimate activities," and "in turn fre[e] an equal sum that can then be spent on terrorist activities."  H. R. Rep. No. 104–383, p. 81 (1995) (emphasis added).  Finally,

the Government refers to a State Department official's affidavit describing how ostensibly charitable contributions have either been "redirected" to terrorist ends or, even if spent charitably, have "unencumber[ed] *funds* raised from other sources for use in facilitating violent, terrorist activities and gaining political support for these activities." Declaration of Kenneth R. McKune, App. 134, 136 (emphasis added).

The most one can say in the Government's favor about these statements is that they *might* be read as offering highly general support for its argument. The statements do not, however, explain in any detail how the plaintiffs' political-advocacy-related activities might actually be "fungible" and therefore capable of being diverted to terrorist use. Nor do they indicate that Congress itself was concerned with "support" of this kind. The affidavit refers to "funds," "financing," and "goods"—none of which encompasses the plaintiffs' activities. *Ibid.* The statutory statement and the House Report use broad terms like "contributions" and "services" that *might* be construed as encompassing the plaintiffs' activities. But in context, those terms are more naturally understood as referring to contributions of goods, money, or training and other services (say, computer programming) that could be diverted to, or free funding for, terrorist ends. See *infra*, at 15–16. Peaceful political advocacy does not obviously fall into these categories. And the statute itself suggests that Congress did not intend to curtail freedom of speech or association. See §2339B(i) ("Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment"); see also *infra*, at 18–19.

*Second*, the Government says that the plaintiffs' proposed activities will "bolste[r] a terrorist organization's efficacy and strength in a community" and "undermin[e] this nation's efforts to *delegitimize and weaken* those

groups." Government Brief 56 (emphasis added). In the Court's view, too, the Constitution permits application of the statute to activities of the kind at issue in part because those activities could provide a group that engages in terrorism with "legitimacy." *Ante*, at 25. The Court suggests that, armed with this greater "legitimacy," these organizations will more readily be able to obtain material support of the kinds Congress plainly intended to ban—money, arms, lodging, and the like. See *ibid.*

Yet the Government does not claim that the statute forbids *any* speech "legitimating" a terrorist group. Rather, it reads the statute as permitting (1) membership in terrorist organizations, (2) "peaceably assembling with members of the PKK and LTTE for lawful discussion," or (3) "independent advocacy" on behalf of these organizations. Government Brief 66, 61, 13. The Court, too, emphasizes that activities not "*coordinated with*" the terrorist groups are not banned. See *ante*, at 21, 26, 31 (emphasis added). And it argues that speaking, writing, and teaching aimed at furthering a terrorist organization's peaceful political ends could "mak[e] it easier for those groups to persist, to recruit members, and to raise funds." *Ante,* at 25.

But this "legitimacy" justification cannot by itself warrant suppression of political speech, advocacy, and association. Speech, association, and related activities on behalf of a group will often, perhaps always, help to legitimate that group. Thus, were the law to accept a "legitimating" effect, in and of itself and without qualification, as providing sufficient grounds for imposing such a ban, the First Amendment battle would be lost in untold instances where it should be won. Once one accepts this argument, there is no natural stopping place. The argument applies as strongly to "independent" as to "coordinated" advocacy. But see *ante,* at 26–27. That fact is reflected in part in the Government's claim that the ban

here, so supported, prohibits a lawyer hired by a desig-
nated group from filing on behalf of that group an *amicus*
brief before the United Nations or even before this Court.
See Tr. of Oral Arg. 47–49, 53.

That fact is also reflected in the difficulty of drawing a
line designed to accept the legitimacy argument in some
instances but not in others. It is inordinately difficult to
distinguish when speech activity will and when it will not
initiate the chain of causation the Court suggests—a chain
that leads from peaceful advocacy to "legitimacy" to in-
creased support for the group to an increased supply of
material goods that support its terrorist activities. Even
were we to find some such line of distinction, its applica-
tion would seem so inherently uncertain that it would
often, perhaps always, "chill" protected speech beyond its
boundary. In short, the justification, put forward simply
in abstract terms and without limitation, must *always*, or
it will *never*, be sufficient. Given the nature of the plain-
tiffs' activities, "always" cannot possibly be the First
Amendment's answer.

Regardless, the "legitimacy" justification itself is incon-
sistent with critically important First Amendment case
law. Consider the cases involving the protection the First
Amendment offered those who joined the Communist
Party intending only to further its peaceful activities. In
those cases, this Court took account of congressional find-
ings that the Communist Party not only advocated theo-
retically but also sought to put into practice the overthrow
of our Government through force and violence. The Court
had previously accepted Congress' determinations that the
American Communist Party was a "Communist action
organization" which (1) acted under the "control, direction,
and discipline" of the world Communist movement, a
movement that sought to employ "espionage, sabotage,
terrorism, and any other means deemed necessary, to
establish a Communist totalitarian dictatorship," and (2)

"endeavor[ed]" to bring about "the overthrow of existing governments by . . . force if necessary." *Communist Party of United States* v. *Subversive Activities Control Bd.*, 367 U. S. 1, 5–6 (1961) (internal quotation marks omitted).

Nonetheless, the Court held that the First Amendment protected an American's right to belong to that party— despite whatever "legitimating" effect membership might have had—as long as the person did not share the party's unlawful purposes. See, *e.g., De Jonge*, 299 U. S. 353; *Scales*, 367 U. S., at 228–230; *Elfbrandt* v. *Russell*, 384 U. S. 11, 17 (1966); *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 605–610 (1967); *Robel*, 389 U. S. 258 (holding that national security interests did not justify overbroad criminal prohibition on members of Communist-affiliated organizations working in any de- fense-related facility). As I have pointed out, those cases draw further support from other cases permitting pure advocacy of even the most unlawful activity—as long as that advocacy is not "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." *Brandenburg*, 395 U. S., at 447. The Gov- ernment's "legitimating" theory would seem to apply to these cases with equal justifying force; and, if recognized, it would have led this Court to conclusions other than those it reached.

Nor can the Government overcome these considerations simply by narrowing the covered activities to those that involve *coordinated*, rather than *independent,* advocacy. Conversations, discussions, or logistical arrangements might well prove necessary to carry out the speech-related activities here at issue (just as conversations and discus- sions are a necessary part of *membership* in any organiza- tion). The Government does not distinguish this kind of "coordination" from any other. I am not aware of any form of words that might be used to describe "coordination" that

would not, at a minimum, seriously chill not only the kind of activities the plaintiffs raise before us, but also the "independent advocacy" the Government purports to permit. And, as for the Government's willingness to distinguish *independent* advocacy from *coordinated* advocacy, the former is *more* likely, not *less* likely, to confer legitimacy than the latter. Thus, other things being equal, the distinction "coordination" makes is arbitrary in respect to furthering the statute's purposes. And a rule of law that finds the "legitimacy" argument adequate in respect to the latter would have a hard time distinguishing a statute that sought to attack the former.

Consider the majority's development of the Government's themes. First, the majority discusses the plaintiffs' proposal to "'train members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes.'" *Ante*, at 31–32 (quoting 552 F. 3d, at 921, n. 1). The majority justifies the criminalization of this activity in significant part on the ground that "peaceful negotiation[s]" might just "bu[y] time . . . , lulling opponents into complacency." *Ante,* at 32. And the PKK might use its new information about "the structures of the international legal system . . . to threaten, manipulate, and disrupt." *Ibid.*

What is one to say about these arguments—arguments that would deny First Amendment protection to the peaceful teaching of international human rights law on the ground that a little knowledge about "the international legal system" is too dangerous a thing; that an opponent's subsequent willingness to negotiate might be faked, so let's not teach him how to try? What might be said of these claims by those who live, as we do, in a Nation committed to the resolution of disputes through "deliberative forces"? *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring).

In my own view, the majority's arguments stretch the

concept of "fungibility" beyond constitutional limits. Neither Congress nor the Government advanced these particular hypothetical claims. I am not aware of any case in this Court—not *Gitlow* v. *New York*, 268 U. S. 652 (1925), not *Schenck* v. *United States*, 249 U. S. 47 (1919), not *Abrams*, 250 U. S. 616*,* not the later Communist Party cases decided during the heat of the Cold War—in which the Court accepted anything like a claim that speech or teaching might be criminalized lest it, *e.g.*, buy negotiating time for an opponent who would put that time to bad use.

Moreover, the risk that those who are taught will put otherwise innocent speech or knowledge to bad use is omnipresent, at least where that risk rests on little more than (even informed) speculation. Hence to accept this kind of argument without more and to apply it to the teaching of a subject such as international human rights law is to adopt a rule of law that, contrary to the Constitution's text and First Amendment precedent, would automatically forbid the teaching of any subject in a case where national security interests conflict with the First Amendment. The Constitution does not allow all such conflicts to be decided in the Government's favor.

The majority, as I have said, cannot limit the scope of its arguments through its claim that the plaintiffs remain free to engage in the protected activity *as long as it is not "coordinated."* That is because there is no practical way to organize classes for a group (say, wishing to learn about human rights law) without "*coordination*." Nor can the majority limit the scope of its argument by pointing to some special limiting circumstance present here. That is because the only evidence the majority offers to support its general claim consists of a single reference to a book about terrorism, which the Government did not mention, and which apparently says no more than that at one time the PKK suspended its armed struggle and then returned to it.

Second, the majority discusses the plaintiffs' proposal to "'teach PKK members how to petition various representative bodies such as the United Nations *for relief*.'" *Ante*, at 32 (quoting 552 F. 3d, at 921, n. 1; emphasis added). The majority's only argument with respect to this proposal is that the relief obtained "could readily include monetary aid," which the PKK might use to buy guns. *Ante*, at 32. The majority misunderstands the word "relief." In *this* context, as the record makes clear, the word "relief" does not refer to "money." It refers to recognition under the Geneva Conventions. See App. 57–58 (2003 Complaint); *id.,* at 79–80 (1998 Complaint); *id.,* at 113 (Fertig Declaration); see also Tr. of Oral Arg. 63 (plaintiffs' counsel denying that plaintiffs seek to teach about obtaining relief in the form of money).

Throughout, the majority emphasizes that it would defer strongly to Congress' "informed judgment." See, *e.g., ante*, at 30. But here, there is no evidence that Congress has made such a judgment regarding the specific activities at issue in these cases. See *infra*, at 20–21. In any event, "whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open [for judicial determination] whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature." *Whitney*, *supra*, at 378–379 (Brandeis, J., concurring). In such circumstances, the "judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution." *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 844 (1978). Hence, a legislative declaration "does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to

validity under the Federal Constitution.*"* *Whitney*, *supra*, at 378; see also *Landmark, supra*, at 843 ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake").

I concede that the Government's expertise in foreign affairs may warrant deference in respect to many matters, *e.g.*, our relations with Turkey. Cf. *ante*, at 27–28. But it remains for this Court to decide whether the Government has shown that such an interest justifies criminalizing speech activity otherwise protected by the First Amendment. And the fact that other nations may like us less for granting that protection cannot in and of itself carry the day.

Finally, I would reemphasize that neither the Government nor the majority points to any specific facts that show that the speech-related activities before us are fungible in some *special way* or confer some *special* legitimacy upon the PKK. Rather, their arguments in this respect are general and speculative. Those arguments would apply to virtually all speech-related support for a dual-purpose group's peaceful activities (irrespective of whether the speech-related activity is coordinated). Both First Amendment logic and First Amendment case law prevent us from "sacrific[ing] First Amendment protections for so speculative a gain." *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 127 (1973); see also *Consolidated Edison Co.*, 447 U. S., at 543 (rejecting proffered state interest not supported in record because "[m]ere speculation of harm does not constitute a compelling state interest").

## II

For the reasons I have set forth, I believe application of the statute as the Government interprets it would gravely and without adequate justification injure interests of the kind the First Amendment protects. Thus, there is "a

serious doubt" as to the statute's constitutionality. *Crowell*, 285 U. S., at 62. And where that is so, we must "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Ibid.;* see also *Ashwander*, 297 U. S., at 346–348 (Brandeis, J., concurring); *Zadvydas* v. *Davis*, 533 U. S. 678, 689 (2001); *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 78 (1994); *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916).

I believe that a construction that would avoid the constitutional problem is "fairly possible." In particular, I would read the statute as criminalizing First-Amendment-protected pure speech and association only when the defendant knows or intends that those activities will assist the organization's unlawful terrorist actions. Under this reading, the Government would have to show, at a minimum, that such defendants provided support that they knew was significantly likely to help the organization pursue its unlawful terrorist aims.

A person acts with the requisite knowledge if he is aware of (or willfully blinds himself to) a significant likelihood that his or her conduct will materially support the organization's terrorist ends. See *Allen* v. *United States*, 164 U. S. 492, 496 (1896); cf. ALI, Model Penal Code §2.02(2)(b)(ii) (1962). See also *United States* v. *Santos*, 553 U. S. 507, 521 (2008) (plurality opinion); cf. Model Penal Code §2.02(7) (willful blindness); S. Rep. No. 95–605, pt. 1, pp. 59–60 (1977). A person also acts with the requisite intent if it is his "conscious objective" (or purpose) to further those same terrorist ends. See *United States* v. *Bailey*, 444 U. S. 394, 408 (1980); Model Penal Code §§2.02(2)(a) and 2.02(5) ("When acting knowingly suffices to establish an element, such element also is established if a person acts purposely"). On the other hand, for the reasons I have set out, see *supra,* at 9–12, knowledge or intent that this assistance (aimed at lawful activities)

could or would help further terrorism simply by helping to legitimate the organization is not sufficient.

This reading of the statute protects those who engage in pure speech and association ordinarily protected by the First Amendment. But it does not protect that activity where a defendant purposefully intends it to help terrorism or where a defendant knows (or willfully blinds himself to the fact) that the activity is significantly likely to assist terrorism. Where the activity fits into these categories of purposefully or knowingly supporting terrorist ends, the act of providing material support to a known terrorist organization bears a close enough relation to terrorist acts that, in my view, it likely can be prohibited notwithstanding any First Amendment interest. Cf. *Brandenburg,* 395 U. S. 444. At the same time, this reading does not require the Government to undertake the difficult task of proving which, as between peaceful and nonpeaceful purposes, a defendant specifically preferred; knowledge is enough. See *Bailey*, *supra,* at 405 (defining specific intent).

This reading is consistent with the statute's text. The statute prohibits "*knowingly* provid[ing] *material* support or resources to a foreign terrorist organization." §2339B(a)(1) (emphasis added). Normally we read a criminal statute as applying a *mens rea* requirement to all of the subsequently listed elements of the crime. See *Flores-Figueroa* v. *United States*, 556 U. S. ___, ___ (2009) (slip op., at 6–7). So read, the defendant would have to know or intend (1) that he is *providing* support or resources, (2) that he is providing that support *to a foreign terrorist organization*, and (3) that he is providing support that is *material,* meaning (4) that his support bears a significant likelihood of furthering the organization's terrorist ends.

This fourth requirement flows directly from the statute's use of the word "material." That word can mean being of a physical or worldly nature, but it also can mean "being of

real importance or great consequence." Webster's Third
New International Dictionary 1392 (1961). Here, it must
mean the latter, for otherwise the statute, applying only to
physical aid, would not apply to speech at all. See also
§2339A(b)(1) (defining "'material support or resources'" as
"any property, *tangible or intangible*" (emphasis added)).
And if the statute applies only to support that would likely
be of real importance or great consequence, it must have
importance or consequence in respect to the organization's
terrorist activities. That is because support that is not
significantly likely to help terrorist activities, for purposes
of this statute, neither has "importance" nor is of "great
consequence."

The statutory definition of "material support" poses no
problem. The statute defines "material support" through
reference to a list of terms, including those at issue here—
"training," "expert advice or assistance," "personnel," and
"service." §2339B(g)(4); §2339A(b)(1). Since these latter
terms all fall under the definition of the term "*material
support,*" these activities fall within the statute's scope
only when they too are "material." Cf. *Stevens*, 559 U. S.,
at ___ (slip op., at 12) (citing *Leocal* v. *Ashcroft*, 543 U. S.
1, 11 (2004) (definitional phrase may take meaning from
the term to be defined)).

Thus, textually speaking, a statutory requirement that
the defendant *knew* the support was material can be read
to require the Government to show that the defendant
knew that the consequences of his acts had a significant
likelihood of furthering the organization's terrorist, not
just its lawful, aims.

I need not decide whether this is the only possible read-
ing of the statute in cases where "material support" takes
the form of "currency," "property," "monetary instru-
ments," "financial securities," "financial services," "lodg-
ing," "safehouses," "false documentation or identification,"
"weapons," "lethal substances," or "explosives," and the

like. §2339A(b)(1). Those kinds of aid are inherently more likely to help an organization's terrorist activities, either directly or because they are fungible in nature. Thus, to show that an individual has provided support of those kinds will normally prove sufficient for conviction (assuming the statute's other requirements are met). But where support consists of pure speech or association, I would indulge in no such presumption. Rather, the Government would have to prove that the defendant knew he was providing support significantly likely to help the organization pursue its unlawful terrorist aims (or, alternatively, that the defendant intended the support to be so used).

The statute's history strongly supports this reading. That history makes clear that Congress primarily sought to end assistance that takes the form of fungible donations of money or goods. See, *e.g.,* H. R. Rep. No. 104–383, at 38, 43–45, 81; *supra*, at 8–9. It shows that Congress, when referring to "expert services and assistance" for example, had in mind training that was sufficiently fungible to further terrorism directly, such as an aviation expert's giving "advice" that "facilitat[es] an aircraft hijacking" or an accountant's giving "advice" that will "facilitate the concealment of funds used to support terrorist activities." Hearing on Administration's Draft Anti-Terrorism Act of 2001 before the House Committee on the Judiciary, 107th Cong., 1st Sess., 61 (2001).

And the Chairman of the Senate Committee on the Judiciary, when reporting the relevant bill from Committee, told the Senate:

> "This bill also includes provisions making it a crime to knowingly provide material support *to the terrorist functions of* foreign groups designated by a Presidential finding to be engaged in terrorist activities." 142 Cong. Rec. S3354 (1996) (statement of Sen. Hatch) (emphasis added).

He then added:

> "I am convinced we have crafted a narrow but effective designation provision which meets these obligations *while safeguarding the freedom to associate,* which none of us would willingly give up." *Id.,* at S3360.

Consistent with this view, the statute itself says:

> "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." §2339B(i).

In any event, the principle of constitutional avoidance demands this interpretation. As Part II makes clear, there is a "serious" doubt—indeed, a "grave" doubt—about the constitutionality of the statute insofar as it is read to criminalize the activities before us. *Crowell*, 285 U. S., at 62; see also *Ashwander*, 297 U. S., at 346–348 (Brandeis, J., concurring); *Jin Fuey Moy*, 241 U. S., at 401. We therefore must "read the statute to eliminate" that constitutional "doub[t] so long as such a reading is not plainly contrary to the intent of Congress." *X-Citement Video, Inc.*, 513 U. S., at 78.

For this reason, the majority's statutory claim that Congress did not use the word "knowingly" as I would use it, *ante*, at 12–13, and n. 3, is beside the point. Our consequent reading is consistent with the statute's text; it is consistent with Congress' basic intent; it interprets but does not significantly add to what the statute otherwise contains. Cf. *e.g., United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 373–374 (1971) (constitutionally compelled to add requirement that "forfeiture proceedings be commenced within 14 days and completed within 60 days" despite absence of any statutory time limits); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 507 (1979)

(constitutionally compelled to interpret "employer" as implicitly excluding "church-operated schools" despite silence and eight other different but explicit exceptions). We should adopt it.

## III

Having interpreted the statute to impose the *mens rea* requirement just described, I would remand the cases so that the lower courts could consider more specifically the precise activities in which the plaintiffs still wish to engage and determine whether and to what extent a grant of declaratory and injunctive relief were warranted. I do not see why the majority does not also remand the cases for consideration of the plaintiffs' activities relating to "advocating" for the organizations' peaceful causes. See *ante*, at 19–20, 32–33.

The majority does not remand, apparently because it believes the plaintiffs lose automatically in that these "advocacy" claims are too general. It adds that the plaintiffs did not "suggest what exactly their 'advocacy' would consist of." *Ante,* at 33. But the majority is wrong about the lack of specificity. The record contains complaints and affidavits, which describe in detail the forms of advocacy these groups have previously engaged in and in which they would like to continue to engage. See App. 56–63, 78–87, 95–99, 110–123.

Moreover, the majority properly rejects the Government's argument that the plaintiffs' speech-related activities amount to "conduct" and should be reviewed as such. Government Brief 44–57. Hence, I should think the majority would wish the lower courts to reconsider this aspect of the cases, applying a proper standard of review. See, *e.g., Philip Morris USA* v. *Williams,* 549 U. S. 346, 357–358 (2007); *Johnson* v. *California* 543 U. S. 499, 515 (2005); cf. *Ricci* v. *DeStefano*, 557 U. S. ___, ___ (2009) (slip op., at 25) (GINSBURG, J., dissenting) ("When this Court

formulates a new legal rule, the ordinary course is to remand and allow the lower courts to apply the rule in the first instance").

## IV

In sum, these cases require us to consider how to apply the First Amendment where national security interests are at stake. When deciding such cases, courts are aware and must respect the fact that the Constitution entrusts to the Executive and Legislative Branches the power to provide for the national defense, and that it grants particular authority to the President in matters of foreign affairs. Nonetheless, this Court has also made clear that authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals. Cf. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 536 (2004) ("We have long since made clear that a state of war is not a blank check . . . when it comes to the rights of th[is] Nation's citizens"). In these cases, for the reasons I have stated, I believe the Court has failed to examine the Government's justifications with sufficient care. It has failed to insist upon specific evidence, rather than general assertion. It has failed to require tailoring of means to fit compelling ends. And ultimately it deprives the individuals before us of the protection that the First Amendment demands.

That is why, with respect, I dissent.