Opinion for the court filed by Circuit Judge TATEL.
Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.
Concurring opinion filed by Circuit Judge TATEL.
Opinion concurring in part and dissenting in part filed by Circuit Judge BROWN.
TATEL, Circuit Judge:
While providing security for a U.S. State Department convoy in the Gaza Strip, Mark Parsons was killed by a roadside bomb. Parsons’s estate and his family sued the Palestinian Authority under the Anti-Terrorism Act of 1991, alleging that the Authority had provided material support for and conspired with the terrorist or terrorists who detonated the bomb. Concluding that the Parsons family had produced insufficient evidence to create genuine disputes of material fact on these Anti-Terrorism Act claims, the district court granted summary judgment to the Palestinian Authority. Although we agree with the district court that the family’s conspiracy claim theories are too speculative to survive summary judgment, we believe a reasonable juror could conclude that Palestinian Authority employees provided material support to the bomber. Accordingly, we affirm with respect to the conspiracy claim but reverse as to material support.
I.
In the midst of the Second Intifada, on October 15, 2003, a United States Depart *120 ment of State convoy traveled through the Gaza Strip on the way to interview Palestinian Fulbright Scholarship applicants. Besides State Department officials, the convoy included a Palestinian Authority Civil Police car in the lead position and DynCorp International employees under contract with the State Department to provide security. While the convoy traveled along Salahadeen Road, approximately 20 meters — or about one-fourth of a city block — from a manned Palestinian Authority security checkpoint, a roadside bomb exploded, killing DynCorp employee Mark Parsons and two of his co-workers.
Immediately after the bombing, Palestinian Authority security and police forces took control of the site, gathered forensic evidence, and launched an investigation run by the Palestinian Authority’s Preventive Security Services. United States and Israeli authorities also launched their own investigations.
During its investigation, the Palestinian Authority detained and interrogated six suspects, “a number of’ whom, according to the official having overall responsibility for the investigation, “admitted to possessing and planting explosive charges in the past, targeted at Israeli military incursions into Gaza.” One of those suspects was Amer Qarmout, a leader of the Popular Resistance Committees (“PRC”). During his interrogation, Qarmout recounted how, two or three days prior to the bombing, he supervised the digging of a hole on Salahadeen Street in which he planned to place a bomb. Qarmout and “fellow members in the Resistance” dug the hole “in front of the [Palestinian Authority] National Security Service.” Qarmout explained: “I introduced myself to the National Security soldiers and asked them to turn their attention from the young men who were planting the device.” But denying he ever planted a bomb, Qarmout claimed that after the “explosion targeting the U.S. convoy took place ... I called Joma’a Abou Loze[, who had helped dig the hole,] and asked him not to move about in the place and not to plant the device because of the dangers involved.”
Qarmout also admitted to having possessed three bombs one month prior to the bombing. He described the bombs as using detonating cables, employing urea as the explosive material, and weighing 30 to 35 kilograms, 20 to 25 kilograms, and 10 to 12 kilograms. According to Qarmout, it was the 12 kilogram bomb that he had intended to plant on Salahadeen Road.
In the course of their investigations, the Palestinian Authority and the FBI conducted forensic analyses of the bomb that killed Parsons. Both determined, among other things, that the bomb contained urea nitrate. The Authority’s analysis added that the bomb weighed approximately 30 to 40 kilograms and was detonated using cables. Moreover, a memo found in the Palestinian Authority’s investigative file concludes, based on “[t]he lid of the device, the type of detonator, the cables used, the poorly connected batteries, the type of explosive material, [and] the outer casing of the device[,] ... that the structure of this device is the same structure used by the Popular Resistance Committees.”
To this day, neither the Palestinian Authority nor Israel nor the United States has publicly identified the bomber. The reason, according to the Palestinian Authority, is that all three investigations remain open and the “identity of the individuals or group responsible for planning and carrying out the bombing has never been determined.” Appellees’ Br. 2. The Parsons family disputes whether the Palestinian Authority has indeed failed to identify those responsible for the attack.
Nearly four years after the bombing, Parsons’s estate, his siblings, and his par- *121 exits’ estate filed this lawsuit in the U.S. District Court for the District of Columbia against the Palestinian Authority and the Palestinian Liberation Organization, alleging that each organization was at least partially responsible for the attack. Although the family’s complaint raised several claims, at issue in this appeal are just two, both brought under the Anti-Terrorism Act of 1991 against the Palestinian Authority (but not the Palestinian Liberation Organization) for allegedly providing material support to and conspiring with the terrorist or terrorists who set and detonated the bomb. In support of these claims, the Parsons family advanced several theories for linking the Palestinian Authority to the attack, only three of which are relevant to this appeal: that Palestinian National Security forces at the nearby checkpoint agreed to look the other way while the bomb was planted; that Authority personnel tipped off the bomber about the convoy; and that the Authority provided weapons to the bomber.
Among the evidence the Parsons family offered to prove these theories, three documents — discovered in the Palestinian Authority’s investigative file and that the parties and the district court have thus far treated as admissible — are central to this case. The first document (quoted above) is Qarmout’s statement to Palestinian Authority interrogators in which Qarmout admits that he prepared to plant a bomb on Salahadeen Road in approximately the same location as the bomb that killed Parsons. In that statement, Qarmout also describes the three bombs he possessed in the month prior to this attack. The second piece of evidence (also referenced above) is the FBI’s forensic report. Lastly, the family relied on a two-page memo having an unidentified author addressed to the “Director General of the Preventive Security Service,” the significance of which the parties forcefully debate. In a section titled “Conclusion and personal interpretation of what happened according to the information in my possession,” the memo includes several statements about the role Palestinian Authority employees played in the bombing including:
• “The explosive device was planted 20 meters away from the National Security checkpoint, a fact that indicates that those present in front of the checkpoint that day have previous knowledge of the presence of the device.”
• “[Ajfter information of the arrival of U.S. embassy staff was leaked, either by the National Security personnel at the checkpoint or by those who were accompanying the convoy, the person responsible for the explosion detonated the device.”
The memo also includes several observations about the bomb, see supra at 120, as well as two statements about when the device was prepared and buried:
• “After examining the material used, we learned it had been prepared more than twenty days earlier and that a substantial portion of the nitric acid had been lost, separated from the urea, and reacted with the iron in the outer casing.”
• “As we mentioned above, the device was present for 20 days at least....”
In addition, the Parsons family claimed they could prove that Amer Qarmout and/or the Popular Resistance Committees directly carried out the attack. Moreover, the family insisted that even if they were unable to identify the actual bomber, they could nonetheless prevail so long as they could show what role the Palestinian Authority had played.
The district court, focusing on the three items of evidence, granted the Palestinian Authority’s motion for summary judgment. The court first held that plaintiffs advanc *122 ing material support claims under the Anti-Terrorism Act must identify “what terrorist organization or individual carried out the attack.” Estate of Parsons v. Palestinian Auth., 715 F.Supp.2d 27, 31 (D.D.C.2010). Concluding that no reasonable juror could find, based on the family’s admissible evidence, that Qarmout, the PRC, or any other specific terrorist or terrorist organization was directly responsible for the bomb, the court rejected the family’s material support claim. Although agreeing that the family need not prove the bombers’ identity for their conspiracy claim, the court nonetheless rejected that claim as well, reasoning that the admissible evidence linking the Palestinian Authority to the attack was too speculative. The Parsons family now appeals. Our review is de novo. See Jones v. Bernanke, 557 F.3d 670, 674 (D.C.Cir.2009) (explaining that we review summary judgment decisions de novo).
II.
The Parsons family brought their material support and conspiracy claims under the civil liability provision of the Anti-Terrorism Act of 1991, which gives United States nationals killed or injured “by reason of an act of international terrorism” (or their estates, survivors, or heirs) the right to bring a civil lawsuit in federal court. 18 U.S.C. § 2333. The Act defines “international terrorism” as activities that, among other things not relevant to this appeal, “involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State.” Id. § 2331(1)(A). In other words, to prevail, a plaintiff must prove that the defendant would have violated any one of a series of predicate criminal laws had the defendant acted within the jurisdiction of the United States. Here, the Parsons family alleges that the Palestinian Authority violated two federal criminal statutes: 18 U.S.C. § 2339A, which makes it a crime to “provide[ ] material support or resources ... knowing or intending that they are to be used in preparation for, or in carrying out, a violation of’ specific violent crimes, including 18 U.S.C. § 2332, which prohibits the killing of a United States national outside the United States; and 18 U.S.C. § 2332(b), which makes it a crime to conspire to kill a United States national outside the United States. The family’s Anti-Terrorism Act claims thus turn on whether they can prove the elements of either section 2339A (the material support claim) or section 2332(b) (the conspiracy claim). In this opinion, we consider the material support claim and announce our judgment with respect to the conspiracy claim.

Material Support

The family first disputes the district court’s interpretation of section 2339A as requiring them to identify the actual bomber. The family may prevail, they claim, so long as they show that the Palestinian Authority provided material support to whoever directly carried out the attack. On this point, the Palestinian Authority never directly challenges the family’s statutory analysis, and for good reason. As the family correctly observes, “[t]he emphasis in 18 U.S.C. § 2339A is upon the material support provider — ‘whoever provides material support or resources’ — not the recipient.” Appellants’ Br. 18.
That said, the family’s theory that Amer Qarmout planted and detonated the bomb and that Palestinian Authority employees gave him material support to that end, would, if proven, at least be sufficient to sustain their material support claim. Accordingly, we first consider whether a rea *123 sonable juror could so conclude, starting with the question of whether the family’s evidence that Qarmout planted and detonated the bomb is sufficient to survive summary judgment.
Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science. Under Federal Rule of Civil Procedure 56, the court must grant summary judgment “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). But what makes for a “genuine” factual dispute? The Supreme Court answered that question in Anderson v. Liberty Lobby, Inc., explaining that the “mere existence of a scintilla of evidence ... will be insufficient” to defeat summary judgment. 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Applying that standard requires us to examine both the “caliber” and the “quantity” of the family’s evidence “through the prism of the substantive evidentiary burden” — for these claims, the preponderance of the evidence standard. Id. at 254, 106 S.Ct. 2505. That said, Liberty Lobby also warns against “denigratfing] the role of the jury.” Id. at 255, 106 S.Ct. 2505. To that end, the Supreme Court emphasized, “Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Id.
We believe that the Parsons family’s evidence is sufficient to meet this burden with respect to whether Qarmout planted and detonated the bomb. Qarmout himself admitted that two or three days prior to the attack, he prepared to plant a bomb in the approximate location of the bomb that killed Parsons. Qarmout also said that around the time of the killing he possessed a bomb that weighed 30 to 35 kilograms, employed urea as the explosive, and used cable detonators. The bomb described by the FBI and the Palestinian Authority’s analyses largely matches that profile. Both describe a bomb employing urea nitrate as the explosive material, and the Authority analysis reports that the bomb weighed 30 to 40 kilograms and used cable detonators. Moreover, the memo in the Palestinian Authority’s investigative file concludes that “the structure of this device is the same structure used by the Popular Resistance Committees”' — -the very same terrorist organization of which Qarmout was a leader.
The district court took note of most of this evidence, acknowledging that “[e]vidence that someone prepared to do something [i.e., that Qarmout prepared to plant a bomb] is of course relevant to the question of whether the person actually did it,” Estate of Parsons, 715 F.Supp.2d at 32, that the memo’s conclusion linking the bomb to the Popular Resistance Committees “is essentially of a factual nature and does have some relevance, as it tends to show a pattern or practice by the PRC,” id., and that “[t]here is also evidence that Qarmout is a PRC member, so it may be sensible to consider the evidence related to Qarmout and the PRC together,” id. at 33 n. 4. Even so, the district court found this evidence insufficient. Qarmout’s admissions were not enough “in light of his denial of actually orchestrating the bombing.” Id. at 32. Moreover, “[t]here is at least some indication that the bomb had been present for 20 days prior to the explosion ... contrary to Qarmout’s account” that he was preparing to plant a bomb only two or three days prior to the attack. Id. at 32 n. 2. As for the Palestinian Authority memo, because it “is undated and anonymous, its weight is minimal.” Id. at 32. And in any event, “the bare fact that *124 the bomb used resembles PRC bombs of the past adds so little weight to the Qarmout evidence that the evidence remains insufficient to establish the identity of the bomber.” Id. at 33 n. 4.
Supplementing the district court’s analysis, the Palestinian Authority argues that in light of Qarmout’s history of targeting the Israeli military “[tjhere is no evidence that Qarmout would have targeted a U.S. diplomatic convoy.” Appellees’ Br. 37. At oral argument, the Authority also pointed to Qarmout’s statement that he intended to plant his 12 kilogram bomb, not the 30 to 35 kilogram one. Recording of Oral Arg. 17:54-18:57.
Although these evidentiary criticisms certainly have force, they are, given the teachings of Liberty Lobby, more properly directed to the jury. In our view, a reasonable juror could conclude that Qarmout never planted a bomb; that the actual bomb had been in the ground for twenty days, long before Qarmout began digging his hole; that Qarmout planted a different bomb; or even that he planted the bomb to target Israelis but never detonated it. A reasonable juror, however, could also believe Qarmout’s incriminating statements but disbelieve his exculpatory ones, and thus conclude that he lied about calling off the bombing. Likewise, a reasonable juror could find that Qarmout planned to and did plant the 30 to 35 kilogram bomb that had been in his possession, as opposed to the 12 kilogram bomb referred to in his statement. And it would hardly be unreasonable for a juror to conclude that the reference in the Palestinian Authority memo to the bomb having been in the ground for twenty days was a misstatement and that in fact the memo’s author meant to write only that the bomb had been prepared, but not necessarily planted, twenty days earlier. After all, the memo first says the bomb “had been prepared more than twenty days earlier,” meaning that its later statement — “as we mentioned above, the device was present for 20 days at least” — could be read as only cross-referencing that earlier statement. Sorting out these contradictions, deciding how much weight to give evidence that supports or undermines the family’s case, and evaluating how much credibility to assign Qarmout’s incriminating versus exculpatory statements are prototypical jury functions that courts may not commandeer. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505. We therefore conclude that the Parsons family has demonstrated the existence of a genuine dispute of material fact as to whether Qarmout was the bomber.
The Authority next disputes on both evidentiary and legal grounds whether the family can show that the Palestinian Authority provided Qarmout with material support. As for its evidentiary objection, the Authority questions any assertion that the National Security personnel at the checkpoint complied with Qarmout’s request to “turn their attention” away from the planting of a bomb. It points out not only that Qarmout’s statement makes no mention of whether and how the guards responded, but also that Qarmout describes only a conversation while he was digging a hole, not during the more serious activity of planting a bomb. Moreover, relying on another passage in Qarmout’s statement in which he describes how personnel at a different National Security checkpoint thwarted one of Qarmout’s previous bomb-planting missions, the Authority argues that the personnel at this checkpoint would have stopped Qarmout from planting a bomb. Appellees’ Br. 38.
Once again, such evidentiary arguments are properly addressed to the jury, not to the court. Recall that at summary judgment the non-moving party is entitled to *125 all “justifiable inferences” in its favor. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505. Here, a reasonable juror could justifiably infer from Qarmout’s statement and from the fact that the checkpoint was only 20 meters from the bomb site that in response to Qarmout’s request, the Palestinian Security forces stationed there either expressly, or implicitly through their actions, agreed to and did “turn their attention” from Qarmout’s bomb planting activities.
The Authority accuses the family of failing to “parse the language of the material support statute” or to “cite any legal authority” establishing that complying with Qarmout’s request to look the other way while he planted a bomb, constituted material support within the meaning of section 2339A. Appellees’ Br. 43. The family responds that the security forces’ conduct falls under two categories listed in section 2339A(b)(l)’s definition of “material support or resources” — namely, “service” and “personnel.” 18 U.S.C. § 2339A(b)(l).
We begin with “service.” Although section 2339A nowhere defines that term, the Supreme Court provided a definition just last year in Holder v. Humanitarian Law Project, — U.S.-, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010), a case involving a closely related material support statute, section 2339B, that outlaws “knowingly providing] material support or resources to a foreign terrorist organization.” 18 U.S.C. § 2339B(a)(l). There, the Court explained that “service” “refers to concerted activity” (as opposed to “independent activity”) and carries its “ordinary meaning” — i.e., “ ‘the performance of work commanded or paid for by another: a servant’s duty: attendance on a superior’; or ‘an act done for the benefit or at the command of another.’ ” Humanitarian Law Project, 130 S.Ct. at 2721-22 (quoting Webster’s Third New International Dictionary 2075 (1993)). Although the Court defined that term in the context of a different statute than the one we deal with here, we generally presume, absent some indication to the contrary, that Congress intends identical terms to have identical meanings in related provisions, and no such indication exists here. See Comm’r v. Lundy, 516 U.S. 235, 249-50, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996). Moreover, defining “service” differently in sections 2339A and 2339B seems particularly inappropriate given that the latter provision expressly borrows its definition of “material support or resources,” including “service,” from the former. See 18 U.S.C. § 2339B(g)(4). Indeed, when discussing “service” in Humanitarian Law Project, the Court cites not only to section 2339B, but also to section 2339A’s material support definition. Humanitarian Law Project, 130 S.Ct. at 2721-22 (citing 18 U.S.C. § 2339A(b)(l)).
Assuming, as we must at this stage of the litigation, that the checkpoint personnel acted as the Parsons family claims, we think the security forces’ conduct falls comfortably within Humanitarian Law Project’s definition of “service.” As security personnel assigned to a checkpoint, they were presumably responsible for preventing terrorists from planting and detonating bombs nearby. Moreover, they allegedly acted in response to Qarmout’s request. In effect, then, at a terrorist’s behest, these security officers agreed to and did affirmatively remove the threat that local law enforcement officers would themselves interfere with the terrorist’s efforts to plant a bomb — actions functionally the same as distracting a beat-cop so that someone else can safely break the law without police intrusion. Because that is surely an act done in concert with and for the benefit of a terrorist, it constitutes providing a “service” and therefore materi *126 al support within the meaning of section 2339A.
Given this conclusion, we need not address the trickier question of whether the security forces’ alleged conduct also constitutes providing “personnel.” We say trickier because we are at least unsure whether that conduct qualifies as providing “personnel” as section 2339B defines that term and because although some courts have concluded that “personnel” has a different and broader meaning in section 2339A, at least one of those courts has also acknowledged the existence of strong arguments to the contrary. See United States v. Abu-Jihaad, 600 F.Supp.2d 362, 399^100 (D.Conn.2009) (concluding that one can provide “personnel” for the purposes of section 2339A so long as there is some form of coordination, joint action, or shared understanding between the personnel provider and the terrorist but acknowledging arguments for applying section 2339B’s narrower definition, which expressly requires working, or providing others to work, under a terrorist’s “direction or control”); see also United States v. Abdi, 498 F.Supp.2d 1048, 1057-58 (S.D.Ohio 2007). We, however, shall leave resolution of that issue for another day.
In sum, we conclude that a reasonable juror could find on the basis of the family’s evidence that Qarmout planted the bomb that killed Parsons and that Palestinian Security forces at the nearby security checkpoint complied with Qarmout’s request not to interfere with his effort to plant a bomb. Because such acts qualify as providing material support under section 2339A, we reverse the district court’s grant of summary judgment to the Palestinian Authority on the family’s material support claim. Having reached this conclusion, we have no need to consider the Parsons family’s other evidentiary theories with respect to their material support claim. We note, however, that because the panel is divided on the issue, we have reached no binding decision about whether the Parsons family has shown a genuine dispute of material fact as to the scienter element of their material support claim. See 18 U.S.C. § 2339A (criminalizing the provision of “material support or resources ... knowing or intending that they are to be used in preparation for, or in carrying out, a violation of’ specific violent crimes, including 18 U.S.C. § 2332, which prohibits the killing of a United States national outside the United States (emphasis added)). Compare Opinion of Judge Henderson 127-32 (“Henderson Op.”) (concluding that the Parsons family has failed to satisfy the scienter element), with Opinion of Judge Brown 139-43 (“Brown Op.”) (concluding that the Parsons family has demonstrated a genuine dispute of material fact as to the scienter element), and Opinion of Judge Tatel 137-39 (“Tatel Op.”) (treating as forfeited any argument that the Parsons family has failed to satisfy the scienter element).

Conspiracy

We affirm the district court’s grant of summary judgment as to the family’s conspiracy claim. See Henderson Op. at 127 n. 1, 132; Tatel Op. at 132-38. But see Brown Op. at 143-50.
III.
Finally, the Parsons family argues in the alternative for additional discovery, a request the district court denied. Although we find no abuse of discretion in that decision with respect to the family’s conspiracy claim, see Dunning v. Quander, 508 F.3d 8, 9 (D.C.Cir.2007) (per curiam), the district court may well view the need for additional discovery on the material support claim differently in light of this opinion. We therefore leave this issue to *127 the district court to consider in the first instance on remand.

So ordered.